**NARRAGANSETT INDIAN TRIBE
OF RHODE ISLAND**

v.

**STATE of Rhode Island et al.**

No. 95–191–Appeal.

Supreme Court of Rhode Island.

Nov. 30, 1995.

_____

Arlene M. Violet, John F. Killoy, Charles Hobb, for Plaintiff.

Thomas Dickinson, Asst. Atty. General, Alan Shoer, Asst. Atty. General, Steven Snow, James Purcell, Providence, for Defendant.

**OPINION**

BOURCIER, Justice.

This matter comes before us by submission of a certified question from the Honorable Ernest C. Torres, a judge of the United States District Court for the District of Rhode Island. The request is made pursuant to Rule 6 of the Supreme Court Rules of Appellate Procedure.

There is litigation now pending in the United States District Court for the District of Rhode Island that arises out of the execution of a tribal-state compact as contemplated by the Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d), and which permits the establishment of Class III gaming on the Narragansett lands in Charlestown, Rhode Island. Class III gaming includes all gaming that is not Class I or Class II gaming. 25 U.S.C. § 2703(8). The Federal District Court, by its amended certification order dated April 7, 1995, has certified to the justices of this court, for our opinion, the following question.

> "Whether, under Rhode Island law, the Governor had authority to act on behalf of and to bind the 'State' by executing the Tribal–State Compact dated August 29, 1994, between the State of Rhode Island and the Narragansett Indian Tribe."

Rhode Island's first constitution was adopted in 1842 and introduced the separation-of-powers concept into our state form of government. It served to distribute governmental powers and authority among the legislative, the executive and the judicial departments in the newly created state government. Regarding governmental authority over lotteries, art. IV, sec. 12, in the 1842 Constitution placed all such authority in the General Assembly, where it had apparently been vested since 1633, when King Charles II granted his charter to the colony of Rhode Island. That assumption, which we deem to be historically sound, stems from the language used in art. IV, sec. 12, of the 1842 State Constitution: "All lotteries shall hereafter be prohibited in this state, except those already authorized by the general assembly."

The wording "except those already authorized by the general assembly" evidences and

abets the historical fact that for some one hundred and eighty years prior to 1842, all governmental functions, including authorization of lotteries, had been vested in the General Assembly that was created in and by the 1633 King Charles II Charter. *In re Advisory Opinion to the Governor (Ethics Commission)*, 612 A.2d 1, 14 (R.I.1992).

We also note the immediate recognition by the first General Assembly of its lottery authority when, in its initial session following adoption of the 1842 State Constitution, that Assembly enacted, at its January 1844 session, "An Act in relation to Lotteries and Lottery Tickets." P.L. 1844, p. 422. Section 1 of that act provided:

> "No person shall directly or indirectly set up or put forth any lottery, by whatever name the same may be called: if any person shall offend against the preceding provision, he shall forfeit and pay as a fine a sum not exceeding one thousand dollars, nor less than fifty dollars."

Section 7 in the 1844 Public Law regarding lotteries specifically exempted from its penal provisions, lottery tickets and lotteries authorized or licensed by the General Assembly.

Presently, and at all times pertinent to the litigation from which the certified question before us arises, art. VI, sec. 15, in our State Constitution provides as follows:

> "Lotteries.—All lotteries shall be prohibited in the state except lotteries operated by the state and except those previously permitted by the general assembly prior to the adoption of this section, and all shall be subject to the prescription and regulation of the general assembly."

The use of the language "all lotteries" and "all shall be subject to the prescription and regulation of the general assembly" leaves neither doubt, nor reason to inquire, concerning the meaning intended. *In re Advisory Opinion to Governor*, 612 A.2d at 7. The language used is free of ambiguity and must be given its plain and usually accepted meaning. *Mikaelian v. Drug Abuse Unit*, 501 A.2d 721, 723 (R.I.1985).

We are also cognizant of art. VI, sec. 10, in our present State Constitution. That section retains and preserves in the General Assembly all powers which it previously had exercised, unless otherwise prohibited by specific constitutional provision. We find no constitutional transfer of any authority or power over lotteries from the General Assembly to any other department of state government in our present constitution.

Accordingly, it is clear to us that exclusive authority over lotteries in this state is, and has always been, vested in the General Assembly either by royal charter or by constitution.

We next proceed from that determination to the authority, if any, of the executive department—chief executive in our state government with regard to lotteries. A search for any power and authority given to the executive department—chief executive by virtue of our State Constitution since 1842 reveals none that pertains to lotteries in this state. In fact, the executive department—chief executive has today essentially the same limited powers first given in 1842. All that have been added in the intervening one hundred and fifty-three years since that time, are the Governor's limited pardoning and veto powers.

Counsel for the Narragansett Indian Tribe have urged us to find, however, that the former Governor—Chief Executive who negotiated and executed the compact in question did so on the basis of an implied authority or power. They suggest that we read into the executive-authority language of our present State Constitution the so-called implied-powers doctrine of the presidency, espoused by Alexander Hamilton, namely, that the President, and in this instance, the Governor, should be able to exercise power from sources not specifically enumerated as being executive powers, so long as not forbidden by constitutional text. *See, e.g., Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). That doctrine is not applicable to this court's analysis of the Governor's powers under the Rhode Island Constitution. The United States Constitution limits Congress's authority to the powers specifically enumerated, thereby leaving areas where neither Congress nor the President has the authority to act. Since Congress's authority is limited, the President is given the power to act in

those areas not explicitly covered by the Constitution. Under the Rhode Island Constitution, however, the General Assembly's power is not limited to the powers specifically enumerated whereas the Governor's authority is so limited. Thus, the federal government's balance of power between its executive and the legislative branches is mirrored by the balance of power provisions established in this state's form of government. The Rhode Island chief executive has limited authority, much like Congress. *In re Advisory Opinion to the Governor,* 612 A.2d at 13–14.

On the basis of our particular state constitutional history and judicial interpretation, we find no room in which to permit any such implied power over lotteries in the Governor, as Chief Executive, that would permit him to enter into any compact establishing a lottery operation and facility in this state. All power over lotteries we find to have been specifically vested in the General Assembly by both the 1842 and our present constitutions. As was said by this Supreme Court in 1854, "power exclusively conferred upon one department is, by necessary implication, denied to the other." *Re, Thomas W. Dorr,* 3 R.I. 299, 301 (Supplement June 14, 1854). Absent a specific delegation by the General Assembly of any of its exclusive authority over lotteries to the Governor, he lacked authority to bind the State of Rhode Island to the lottery compact in question. *Chang v. University of Rhode Island,* 118 R.I. 631, 638–40, 375 A.2d 925, 929 (1977). *Accord State ex rel. Stephan v. Finney,* 251 Kan. 559, 577–83, 836 P.2d 1169, 1181–1185 (1992). This interpretation is consistent with art. VI, sec. 10 of our State Constitution, which retains and preserves all powers the General Assembly previously exercised, unless prohibited by a specific constitutional provision.

Our response to the question certified is that the Governor as Chief Executive lacked both constitutional as well as legislative authority to bind the State of Rhode Island by executing the Tribal–State Compact dated August 29, 1994, between the State of Rhode Island and the Narragansett Indian Tribe.

In so responding, we offer no opinion regarding the rights of any of the parties to engage in and conduct Class III gaming under the Indian Gaming Regulatory Act or to renew negotiations to legally produce a tribal-state compact as contemplated by the provisions of the Gaming Act. 25 U.S.C. § 2710(d); R.I. Const. art. VI, sec. 15. We also take care to note that our opinion in no way suggests that the Governor, in his capacity as Chief Executive officer of this state, lacks the authority to advocate, to initiate, and to negotiate, short of executing, a tribal-state compact. All that we determine herein is that the Governor, absent specific authorization from the General Assembly, had no express or implied constitutional right or statutory authority to finally execute and bind the state to such a compact by his execution thereof.