DECISION
This cause is before the Court for decision on the merits. Plaintiff, the Governor, brings this action against the Rhode Island Lottery Commission seeking a declaratory judgment and injunctive relief following a vote of the Lottery Commission to increase the number of video lottery terminals (hereinafter "VLTs") authorized by it at (a) Newport Jai Alai from 426 to 776 and (b) Lincoln Greyhound Park from 1,202 to 1,702. The owners and operators of the Jai Alai, Newport Grand Jai Alai, LLC, and of Lincoln Greyhound Park, Burrillville Racing Association, Inc., together with the Senate as well as the House of Representatives, each have been accorded defendant or defendant-intervenor status in this case. The Governor, as plaintiff, has been joined by the Attorney General as plaintiff-intervenor.
Essentially, the plaintiffs ask this Court to determine that the statutory scheme creating the Lottery Commission or at least so much of it as is found in Title 42, Chapter 61, Section 1 and which reads as follows:
 "(The Commission) shall consist of nine (9) members . . . three (3) of whom shall be members of the Senate, not more than two (2) from the same political party to be appointed by the Majority Leader; three (3) of whom shall be members of the House of Representatives, not more than two (2) from the same political party to be appointed by the Speaker of the House; and three (3) of whom shall be representatives of the general public to be appointed by the Governor."
is unconstitutional because it is violative of our Separation of Powers Doctrine.
Plaintiff Governor asks that, coupled with the declaratory judgment he seeks, this Court enter a permanent injunction against the implementation of the vote by the Commission authorizing the expansion of VLTs as aforesaid.
 HISTORY OF THIS CASE
In order properly to place this case in context with respect to what this Court deems to be its most significant issue, that is to say the so called separation of powers issue, it is important to understand the history of this case. On April 26, 1999, the Lottery Commission, by a five to four vote, authorized an increase in the number of VLTs at the two venues in this state where such machines are permitted. This vote was taken in the face of, and in spite of, clear opposition of the Governor who appeared at the meeting of the Commission. All of the commissioners voting in favor of expansion were members of one or the other of the branches of the legislative department of state government selected either by the Speaker or by the Majority Leader in accordance with the statute quoted above. Those voting against the additional machines were all of the Governor's appointees joined by one member of the legislature.
Shortly after the vote, and before it was implemented, the Governor brought the instant suit. While no temporary restraining order issued, defendant Commission agreed that pending a determination by this Court on plaintiffs motion for preliminary injunctive relief, it voluntarily would refrain from taking further action with respect to its vote.
On May 28th, this Court heard oral arguments from those who, at that time, were parties to the proceedings; that is to say, the Governor, the Lottery Commission, and the entities which owned and operated the facilities directly impacted by the Commission's vote. On June 9th, this Court rendered a bench decision, followed by a written order, granting preliminary injunctive relief precluding the Lottery Commission from implementing its April 26th vote. The Court set a control date of July 1st with respect to the matter, because the Court, as were the parties, was aware that in November 1997, the Governor had sought from the justices of the Supreme Court, their advice with respect to three questions. When this Court rendered its bench decision, it was widely anticipated that the Advisory Opinion would be rendered before the effective date of certain regulations promulgated by the Rhode Island Ethics Commission (July 1, 1999), which regulations would have precluded legislators from serving as members of public boards as defined in the regulations. In its bench decision, this Court noted the pendency of the request for an Advisory Opinion and suggested that answers to certain of the questions propounded by the Governor to the justices would provide guidance to this Court with respect to the ultimate issues at bar.
On June 29, 1999, the Supreme Court published two separate and diverse Advisory Opinions. One of which was signed by four members of that Court, hereinafter referred to as the "Majority Advisory Opinion" and the other by one member of the Supreme Court. The Majority Advisory Opinion found that the Ethics Commission was without power to issue the specific regulation that was the subject of the first question propounded by the Governor and as is detailed infra, respectfully declined to answer the second and third questions (those being the questions, the answers to which this Court had said would provide guidance to it). Advisory Opinion to the Governor (Rhode Island EthicsCommission — Separation of Powers), 732 A.2d 55.
In any event, defendants had sought a stay of this Court's June 10th order from the Supreme Court. On June 30th, the Supreme Court remanded this case to this Court ". . . in order that (it) may reconsider the issuance of a preliminary injunction in light of . . ." the June 29th Advisory Opinions. The Supreme Court entered a further order on July 1st clarifying that its order of June 30th should not be taken to prevent this Court from ". . . considering the propriety of entry of a final judgment" or ". . . engaging in such further proceedings as (it) may consider appropriate under the circumstances."
Subsequent to the July 1st order, this Court entered a decision and order vacating the preliminary injunction of June 10th — conducted an evidentiary hearing on the merits in mid-August — set a briefing schedule, received and reviewed one or more memoranda from each of the parties — and after a recent unanimous vote by defendant Lottery Commission to implement its April 26th vote, denied plaintiff Governor's further request for preliminary injunctive relief.
Having described the short history of this case, this Court notes that Rule 52 of the Rules of Civil Procedure directs that "In all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon. . . ." This Court also notes that in the Majority Advisory Opinion, four of the justices of the Supreme Court declined to answer the questions which would have afforded substantial guidance to this Court, because to do so would have required fact finding.
"In order to answer question two and three, we would be required to make factual determinations in deciding which public and quasi-public boards and commissions are executive in nature," Majority Advisory Opinion at page 72. ". . . the classification of boards as executive or otherwise requires fact-intensive investigation of the nature, purpose, membership, and operation of each board and commission." Id. at 73.
 FINDINGS OF FACT
Based upon the record before this Court, including the testimony adduced during the hearings on August 18th and 19th from John Patrick Hawkins, Gerald S. Aubin and Patrick P. Connelly[1] and the documents admitted as full exhibits, this Court finds the following facts to have been established:
 1. Plaintiff is the Governor of the State of Rhode Island.
 2. Plaintiff intervenor is the Attorney General of the State of Rhode Island.
 3. Defendant Lottery Commission is the Lottery Commission selected as provided in Title 42, Chapter 61, Section 1 of the Rhode Island General Laws.
 4. Defendant Newport Grand Jai Alai, LLC is the owner and operator of the Newport Jai Alai.
 5. Defendant Burrillville Racing Association, Inc. is the owner and operator of Lincoln Greyhound Park.
 6. Defendant the Senate of the State of Rhode Island and Defendant the House of Representatives of the State of Rhode Island constitute the General Assembly of the State of Rhode Island and are the legislative department referred to in its Constitution.
 7. Sections 42-61-1, et seq. and 42-61.2-1, et seq. delegate to the Lottery Commission power to carry out, implement and administer the laws relating to lotteries and to VLTs. The Commission has the power inter alia to determine and/or to provide as to:
 a. Lotteries:
 1. The type of lotteries to be conducted;
 2. The price of tickets with respect to lotteries;
 3. The number and size of prizes on winning tickets;
 4. The manner of selecting winning tickets;
 5. The manner of payment of prizes to the holders of winning tickets;
 6. The frequency of the drawings or selections of winning tickets;
 7. The number and types of locations at which tickets may be sold;
 8. The method to be used in selling tickets;
 9. The licensing of agents to sell tickets;
 10. The license fee to be charged to agents;
 11. The manner in which the proceeds of the sale of tickets are maintained, reported and/or otherwise accounted for;
 12. The manner and amount of compensation to be paid to sales agents necessary to provide for the adequate availability of tickets to prospective buyers and for the convenience of the general public;
 13. The apportionment of the total annual revenue accrued from the sale of tickets and from all other sources for the payment of prizes to the holders of winning tickets;
 14. For payment of costs incurred in the operation and administration of the Lottery, including the expense of the Commission and the cost resulting from any contract or contracts entered into for promotional advertising, consulting, or operational services;
 15. Or for the purchase or lease of facilities, lottery equipment, and materials; and for the repayment of monies appropriated to the lottery fund;
 16. The manner, standards and specification for a process of competitive bidding for Commission purchase and contracts, and;
 17. The sale of commercial advertising space on the reverse side or in other available areas upon lottery tickets provided that all net revenue derived from the sale of the advertising space shall be deposited immediately into the state's general fund.
 b. VLTs:
 1. The licensing of technology providers capable of interfacing with a central communications systems controlled by the Commission (the award of a license to technology providers must satisfy the requirements of the State Purchasing Laws);
 2. Accounting procedures for determining net terminal income from lottery terminals and unclaimed prizes and credits;
 3. The type of video lottery game to be conducted;
 4. The price to play each game and the prizes or credits to be awarded;
 5. Financial reporting procedures for license video lottery retailers and control procedures in the event that any of these retailers should become insolvent;
 6. Insurance and binding by (i) licensed video lottery retailers and (ii) technology providers;
 7. The licensing of licensed video lottery retailers;
 8. Contracting with technology providers;
 9. A provision requiring that all VLTs be linked under a central communications system to provide auditing program information as approved by the Lottery, and;
 10. Any other matter necessary for VLTs or for the convenience of the public.
 and has exercised, and does exercise such power.
 8. The legislation creating the lottery provides for the position of director. The director of lotteries under the applicable statute is appointed by the Governor, subject, however, to confirmation by the Commission, and further, the director of lotteries is removable only by the Commission. By statute, the director of lotteries is vested with certain responsibilities and authority. A review of those statutes specifically § 42-61-4 and § 42-61.2-4 clearly confirm the testimony of Director Aubin to the effect that he works for the nine members of the Commission (see testimony of Director Aubin, page 58, line 3, et seq. August 19, 1999).
 9. The lottery generated gross revenue in its most recent full fiscal year in the amount of $740,720,000 with net revenues of approximately $639,000,000. of the gross revenue $548,100,000 represented VLT sales and $192,620,000 represented lottery sales. After deducting all expenses and the payouts to "successful" lottery and VLT players, and taking into account earnings on investment of lottery funds (handled by the General Treasurer) in the amount of $510,000, the revenue to the state general funds was approximately $135,000,000.
 10. The lottery is a major business enterprise.
 11. Historically, in our state, the General Assembly, from the first lottery authorized by it in 1744 though 1843 when a constitutional prohibition with respect to other than then existing lotteries was imposed, regulated every facit and every detail of every lottery that it created (see testimony of Professor Connelly, page 109, line 11 et seq. transcript of August 19th).[2]
 12. From 1843 until 1973, the constitutional prohibition referred to above remained in effect.
 13. In 1973, our Constitution was amended so that the language contained therein dealing with lotteries now reads:
 "Lotteries. — All lotteries shall be prohibited in the state except lotteries operated by the state and except those previously permitted by the General Assembly prior to the adoption of this section, and all shall be subject to the prescription and regulation of the General Assembly."[3]
Such additional facts as are pertinent to this decision shall be set forth in the discussion which follows.
 DISCUSSION
Turning now to the applicable law to be applied to the facts as found, this Court believes that the proper place to start is with the Majority Advisory Opinion herein before referred to. Of course, the Court is aware that Advisory Opinions issued by our Supreme Court ". . . are of limited precedential effect" Id. at 73.
Be that as it may, the Majority Advisory Opinion issued only months ago represents the view of four of the five justices presently sitting on our Supreme Court and is highly persuasive, if not binding, upon this Court. The majority justices, in their joint Advisory Opinion, noted the historical backdrop to one of the issues presented in this case.[4] They did this by starting with the Royal Charter granted by Charles II of England in 1663 which vested almost unlimited power to govern in the General Assembly. They noted that such power was utilized by the General Assembly to appoint persons, including members of the General Assembly, to ad hoc committees to deal with administrative governmental functions and needs. They pointed out that at the time, the Governor, together with other administrative personnel, constituted the upper house of the General Assembly. At that time, as noted by the majority justices, the General Assembly wielded legislative power, judicial power, and unlimited powers of appointment. Id. at 63.
The Charter of 1663 constituted the basic controlling document in our state until the adoption of the 1842 Constitution. Even under that Constitution, the General Assembly continued, and to this day, continues to have vast powers — although its powers are deemed to be plenary there has been some diminution of those powers over the years occasioned by judicial decision, for example, see Tayler Co. v. Place, 4 RI 324 (1856) for a judicial determination that General Assembly action was judicial and not legislative in nature and thus unconstitutional; Constitutional Amendment, for example, compare Article X, Section 4, on the manner of selecting justices of the Supreme Court prior to and after November 8, 1994; and indeed by action of the General Assembly itself, for example, in the statute here in question by permitting the Governor to appoint three public members to the Lottery Commission.[5]
As indicated above, the majority justices, in responding to the Governor's request for advice, declined to respond to certain questions propounded to them. However, while not directly answering the question as to whether the General Assembly can appoint any of its members or indeed any of its designees (agents) to an executive board or commission (that is to say a board or commission not intended to provide oversight or advice to the legislative department, but rather one such as this Lottery Commission that is to carry out an operational function, i.e., one which is to implement legislation) the majority justices did make particular reference to ". . . a long history of legislative service on and appointments to executive boards and commissions" in our state. Id. at 71. This observation shortly was followed by "We suggest that the sole and proper
procedure for restricting legislators from serving on or appointing `any other person' to executive boards and commissions is through an amendment to the Constitution approved by the electorate, not by an ethics regulation." (Emphasis added.) Id.
at 72.
None of the foregoing is dispositive of the question of whether our Constitution prohibits legislators from constituting a majority of the membership of the Lottery Commission. The Lottery Commission was created by legislation enacted in response to the 1973 Constitutional Amendment discussed above. The text of that amendment does not, of course, refer to a Commission or indeed to any particular entity (other than the "state") as the vehicle to operate a lottery or lotteries. In fact, it does not mandate that there be a lottery. The 1973 Amendment simply negated the constitutional prohibition, which theretofore had existed for approximately 130 years. It accomplished this by specifically providing[6] that only lotteries operated by the state, and those previously permitted by the General Assembly prior to the adoption of what now is Article VI Section 15 of the Constitution, would be permitted and all such lotteries shall be subject to the prescription (proscription) and regulation of the General Assembly.
In examining that language, our Supreme Court in NarragansettIndian Tribe v. State 667 A.2d 280 at 281 (R.I. 1995) indicated in discussing Article VI Section 15 (the lottery provision) that it is:
 ". . . also cognizant of Article VI Section 10 in our present state Constitution. That section retains and preserves in the General Assembly all powers which it previously had exercised unless otherwise prohibited by specific constitutional
provision. We find no constitutional transfer of any authority or power over lotteries from the General Assembly to any other department of state government in our present Constitution." (Emphasis added.)
Justice Bourcier, writing for the unanimous court went on to state:
 "Accordingly, it is clear to us that exclusive authority over lotteries in this state is, and has always been, vested in the General Assembly either by Royal Charter or by Constitution."
The Narragansett Indian Tribe Court searched the Constitution and found no basis for a claim that the executive department had any constitutional power with respect to lotteries, and found further, that the Governor, under our Constitution, lacked any implied powers with respect to lotteries, or otherwise. How then, if at all, can plaintiffs here correctly claim that the legislature, through the legislation providing for the manner of selecting the Commission members, violates a Separation of Powers Doctrine (conceded to exist by the defendants) which has been part of our Constitution since its adoption in 1842? Our Court unambiguously has held in Narragansett Indian Tribe that there is no power express or implied in the executive department with respect to lotteries. Accordingly, this Court is constrained to and does find that the plaintiffs' traditional separation of powers argument must fail. This finding, however, is not in this Court's view terminal with respect to plaintiffs' arguments.
The Court notes that the traditional separation of powers argument deals with the claim that one branch of government has wrongfully intruded into an area reserved to another branch of government. Plaintiffs urge upon this Court a nuance of the traditional Separation of Powers Doctrine; (what the Attorney General calls the "process component" of the Separation of Powers argument), that is to say, they advance the proposition that if the General Assembly is clothed with the power as to lotteries that defendants contend for and which this Court has found that the Narragansett Indian Tribe opinion reading of our Constitution requires, then the exercise of that power through the legislation creating and empowering the Commission is an impermissive delegation of legislative power under our Constitution.
In order properly to analyze this argument, the Court starts with the proposition that under our system, great plenary power is vested in the General Assembly. The inquiry here really is whether that power trumps the general scheme developed over the history of this state and incorporated into our Constitution as originally enacted and as the same has from time to time been amended with respect to the manner in which the legislative department is to exercise the powers accorded to it. For example, this Court noted in its bench decision of June 9, 1999, (transcript page 17, lines 10-17) that the General Assembly undoubtedly has the power to legislate with respect to details of the administration of the lottery. Purporting to exercise that power, here the General Assembly has enacted legislation which creates a Commission, clothes that Commission with, what otherwise would be powers exercisable by the legislative department, (the General Assembly itself) and provides a mechanism for the legislative leadership through the power of appointment of a majority of the members of that Commission to dominate the Commission. That domination and control by the legislative department is accomplished by votes and actions of the Commissioners (a majority of whom are members of the General Assembly)[7] who are surrogates of the legislature as a whole, but without the constitutional controls provided with respect to legislative action under our Constitution.
Under the provisions of our Constitution, particularly Article VI "of the legislative power" Article VII "of the House of Representatives" and Article VIII "of the Senate," legislative action is accomplished through the citizens' elected representatives and/or senators considering and voting upon matters before them in their respective branches of the General Assembly. This bicameral system (except as otherwise provided in our Constitution) affords each member of the General Assembly an opportunity to vote on each exercise of legislative power. It further requires, generally, that each of the branches of the General Assembly concure in the exercise of that power. Under Article IX, Section 14 of the Constitution, there must be presented to the Governor (with limited exceptions) each bill, resolution, or vote which has received agreement of the bicameral legislature (the affirmative exercise of legislative power) for approval, acquiescence, or veto by him/her. Of course, the Governor's veto power is subject to being overridden by a supermajority of each of the branches of the General Assembly. There is no question but that in connection with actions and votes at the Lottery Commission, none of the foregoing occurs.
Having found that the Lottery Commission is exercising legislative power and further having found that the exercise of that power is not constrained by the constitutional legislative processes, this Court does declare the provisions of Title 42, Chapter 61, Section 1 of the General Laws to be unconstitutional to the extent that it requires appointments by the House Speaker and Senate Majority Leader of members of the General Assembly to sit on and comprise a majority of the Lottery Commission membership.
 REQUEST FOR INJUNCTIVE RELIEF
The Governor here also seeks injunctive relief. He asks this Court to permanently enjoin the implementation of the April 26th Lottery Commission vote.[8] For the reasons set forth, infra, that request for relief hereby is denied.
 STAY
The Attorney General notes in his reply brief that the affect of the declaratory judgment hereby ordered may well result in governmental and political uncertainty and even suggests the possibility of economic chaos in our state. (See page 16). This Court is aware that this decision perhaps raises more questions than it answers. For example, can the General Assembly delegate any of its powers with respect to lotteries to an independent agency or to the executive department? Pragmatically, should an executive board or commission operating a major business be within the legislative department? Should the Constitution be amended, at least so as to provide for a Lottery Commission and for its constituency? These and other questions are not raised in the proceeding presently pending before this Court. Even if they were so raised, the Court is mindful of the decision of our Supreme Court in City of Pawtucket. et al. v. Bruce Sundlun, etal., reported at 662, A.2d at 40 (R.I. 1995), where at page 58, our Court said:
 ". . . we refrain from scaling the walls that separate law making from judging, for `were the power of judging joined with the legislative . . . the judge would then be the legislator.' The Federalist papers, no. 47 at 303 (James Madison) (Clinton Rossiter ed., 1961) `so long as the judiciary remains truly distinct from both the legislature and the executive . . . the general liberty of the people can never be endangered from that quarter.' The Federalist papers, no. 78 at 766 (Alexander Hamilton) (Clinton Rossiter ed., 1961)."
In the findings of fact, supra this Court noted the net contribution to the general funds of the State of Rhode Island derived from the lottery. It further noted that the lottery is a business. In fact, it likely is that the lottery is one of the bigger businesses carried on within the State of Rhode Island.
In order to avoid the governmental and political uncertainty that this Court is sure will flow from this decision, in order to obviate any negative economic impact on the state's budget during the pendency of the appeals and cross appeals, which inevitably will flow from the judgment to be entered herein, and in order to give the legislative department ample time within which to address the issues subsequent to a Supreme Court opinion sustaining this decision, this Court will order a stay with respect to the judgment to be entered pursuant hereto until July 1, 2000. In the event that such date is inappropriate due to the date of final Supreme Court action, any party upon notice to all of the other parties may apply to extend this stay.
Counsel shall present an appropriate order and judgment reflecting the foregoing. Said order and judgment to be presented to the Court not later than November 9, 1999.
[1] The Court notes that plaintiffs objected to the testimony of Professor Connelly on grounds of relevance. The testimony was permitted over objection and ultimately the Court reserved decision on a motion to strike. This Court believes that this evidence in fact and in law was relevant within the contemplation of and as defined in Rule 401 of the Rhode Island Rules of Evidence. Accordingly, plaintiffs' motion to strike, hereby is denied.
[2] The Court notes a diminished amount of regulation and a substitution of auditing and taxation in Professor Connelly's testimony found at page 114, line 24 through page 115, line 22 in the August 19th transcript.
[3] The plaintiffs' position that the word "prescription" results from a transposition error and that the word as submitted to the voters was "proscription" is buttressed by the testimony of Mr. Hawkins (see page 9, line 23 through page 11, line 7 transcript of August 18th).
[4] Though the Governor proclaims that it is not necessary to reach the issue of appointment by the General Assembly of even one of its members or agents to an executive board or commission, he as well as most of the parties expend reams of paper discussing this issue.
[5] It follows of course, that where the General Assembly properly has delegated its powers by legislation to other persons or agencies, so too can it reclaim those powers by legislation.
[6] For text of the Amendment, see page 9 supra.
[7] While the legislation provides for three public members appointed by the Governor what the legislation provides, of course, can be changed by further legislation. (See footnote 5supra. See also testimony of John Hawkins, page 15, line 18 through page 16, line 4, transcript of August 18th).
[8] Essentially, because that vote now has to some extent been implemented, the Governor really seeks either (1) to enjoin further implementation of said vote, or (2) a rollback to the situation that pertained before any of the additional VLTs were installed and activated and the Court hereby authorizes the Governor to amend his complaint accordingly.