Kelly, J.
{concurring). In 1997 and 1998, Governor John Engler negotiated tribal-state gaming compacts with four west Michigan tribes. Under their terms, the compacts would become effective only when all of the following occurred:
(A) Endorsement by the tribal chairperson and concurrence in that endorsement by resolution of the Tribal Council;
*337 (B) Endorsement by the Governor of the State and concurrence in that endorsement by resolution of the Michigan Legislature;
(C) Approval by the Secretary of the Interior of the United States; and
(D) Publication in the Federal Register. [Compact with Little Traverse Bands of Odawa Indians, § 11.]
The compacts met all four requirements and became effective on February 18, 1999.
The Legislature approved the compacts by concurrent resolution. The plaintiffs then filed suit asserting that the compacts are legislation. Consequently, they argue, the Michigan Constitution requires that they be approved only by bill. Const 1963, art 4, § 22. At issue in this appeal is whether the approval process used by the Michigan Legislature was constitutional.
A majority of justices, myself included, hold that the tribal-state gaming compacts at issue are not legislation. They are more appropriately viewed as a communication between sovereign entities. The compacts do not impose duties on or restrict the people of the state. Instead, they are contractual in nature, conveying the rights and obligations of the parties, the state, and the various tribes. Therefore, the Legislature’s approval by concurrent resolution was appropriate.
We find unpersuasive Justice MARKMAN’s reliance on this Court’s decision in Blank[1] to reach a contrary conclusion. Blank is inapplicable to this case. Because the tribal-state gaming compacts are valid, a majority affirms the decision of the Court of Appeals in favor of *338 defendants with the exception of the issue regarding the governor’s recent compact amendment. On that issue, a majority agrees to remand the case to the Court of Appeals for consideration of the plaintiffs’ argument.
I. STANDARD OF REVIEW
The circuit court ruled for plaintiffs on cross-motions for summary disposition. Decisions on motions for summary disposition are reviewed de novo. American Federation of State, Co and Muni Employees v Detroit, 468 Mich 388, 398; 662 NW2d 695 (2003). The question presented is whether the legislative action was constitutional. Similarly, issues of constitutionality are reviewed de novo. Harvey v Michigan, 469 Mich 1, 6; 664 NW2d 767 (2003).
II. THE ROLE OF FEDERAL LAW
Through the Commerce Clause, the United States Constitution grants the federal government exclusive jurisdiction over relations with Indian tribes. US Const, art I, § 8, cl 3. The clause gives Congress the power “[t]o regulate commerce with foreign nations, and among the several States, and with the Indian Tribes.” Id. The so-called Indian Commerce Clause places relations with Indian tribes within “the exclusive province of federal law.” Oneida Co v Oneida Indian Nation of New York, 470 US 226, 234; 105 S Ct 1245; 84 L Ed 2d 169 (1985). Given the existence of the Indian Commerce Clause, state law generally is not applicable to Indians on tribal reservations unless Congress has specifically made it applicable. McClanahan v Arizona State Tax Comm, 411 US 164, 170-171; 93 S Ct 1257; 36 L Ed 2d 129 (1973).
*339 In recognition of this principle, the United States Supreme Court has held that, if state gambling policy is regulatory rather than prohibitory, then state law is inapplicable to Indian gaming on Indian lands. California v Cabazon Band of Indians, 480 US 202, 209; 107 S Ct 1083; 94 L Ed 2d 244 (1987). If state law allows gaming but seeks to regulate it, the state is not authorized to enforce that law on Indian reservations. The Cabazon Court made clear that regulation of Indian gaming is fundamentally the province of federal law. Tribes retain the exclusive right to regulate gaming on their lands in states where all gaming activity is not prohibited. Id. at 207.
In response to the Cabazon decision, Congress passed the Indian Gaming Regulatory Act (IGRA), 25 USC 2701 et seq. With this act, Congress has provided a comprehensive federal regulation of tribal gaming. This framework allows state regulation only to the extent that it is negotiated into the terms of a tribal-state compact. Such a compact must set forth the parameters under which an Indian tribe will establish and operate casino-style gaming facilities. 25 USC 2710(d)(3).
IGRA provides that Indian tribes may engage in class III gaming only if “conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . ...” 25 USC 2710(d)(1)(C). Because it is not classified as class I or class II style gaming, the casino-style gambling at issue in this case involves class HI gaming. 25 USC 2703(8).
By allowing the states to play a role through the compacting process, IGRA “extends to the States a power withheld from them by the Constitution.” Seminole Tribe of Florida v Florida, 517 US 44, 58; 116 S Ct 1114; 134 L Ed 2d 252 (1996). IGRA does not furnish states with the ability to unilaterally regulate tribal gaming. *340 Rather, it provides them an opportunity to oversee tribal gaming. The role of the state is limited to the terms the state is able to negotiate with a tribe.
IGRA requires a tribe to obtain a compact with a state in order to engage in casino-style gambling. A compact is
[a]n agreement or contract between persons, nations or states. Commonly applied to working agreements between and among states concerning matters of mutual concern. A contract between parties, which creates obligations and rights capable of being enforced, and contemplated as such between the parties, in their distinct and independent characters. [Black’s Law Dictionary (6th ed).]
States cannot prevent tribal gaming by refusing to negotiate or by demanding unreasonable conditions. They must negotiate in good faith upon a request by the tribe for such negotiation. 25 USC 2710(d)(3)(A). While Seminole held that Eleventh Amendment immunity protects states from suit by Indian tribes, it did not eliminate a state’s duty to negotiate in good faith.
If a state refuses to engage in good-faith negotiations, it can lose its ability to influence the regulation of casino gaming on tribal land. The Seminole Court expressly refused to comment on substitute remedies tribes might seek for a state’s failure to negotiate in good faith. Seminole, supra at 76 n 18.[2]
*341 According to IGRA:
Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity. [25 USC 2701(5).]
Michigan allows various forms of gambling. They include horse racing,[3] a state lottery,[4] and voter-approved casino gambling in the city of Detroit.[5] It cannot reasonably be argued that Michigan prohibits, rather than regulates, gambling. Therefore, Michigan’s direct power with respect to gambling in Indian country is the bargaining power given to it by the federal government through IGRA.
Relying on Blank, Justice Markman argues that the subject of the compacts, state oversight of tribal gaming, can be achieved only through legislation. This misconstrues the state’s ability to pass laws applicable to Indians. It is a unique situation. “State law is generally not applicable to Indian affairs within the territory of an Indian tribe, absent the consent of Congress.” Cohen’s Handbook of Federal Indian Law, § 5.A.
The Michigan Gaming Control and Revenue Act[6] recognized this principle and provided that, in the future, Congress could delegate to the state jurisdiction over Indian gaming on Indian lands. But until or unless that occurs, the only way the parties can authorize *342 Indian gaming is by mutually agreeing to a compact. Were this untrue, the Legislature could simply amend the gaming control act to unilaterally regulate gaming on tribal land.
Plaintiffs argue that 18 USC 1166 gives the state a regulatory role in tribal gaming without the need for a negotiated compact in which the tribe has ceded jurisdiction. Plaintiffs misconstrue 18 USC 1166. This federal statute provides that state laws with respect to gambling apply in Indian country in the same manner in which they apply throughout the rest of the state. 18 USC 1166(a). At 18 USC 1166(d), it provides that
[t]he United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country, unless an Indian tribe pursuant to a Tribal-State compact approved by the Secretary of the Interior ... has consented to the transfer to the State of criminal jurisdiction with respect to gambling on the lands of the Indian tribe.
Section d retains federal jurisdiction over Indian gaming unless a tribe negotiates it away in a compact. Without a compact, a state has no jurisdiction over gaming on Indian land. Hence, 18 USC 1166 does nothing more than adopt state law as the governing federal law for purposes of Indian gaming. United Keetoowah Band of Cherokee Indians v Oklahoma, 927 F2d 1170, 1177 (CA 10, 1991). Plaintiffs’ arguments to the contrary are misguided.
IGRA allows tribes to engage in some forms of gambling. However, in recognition of the state’s interest in the issue, IGRA requires a tribe to have a valid tribal-state gaming compact in place before it can engage in class III gambling. In exchange for giving states this power, IGRA requires the states to negotiate with tribes *343 in good faith. While IGRA provides for the negotiation of tribal-state compacts, it does not specify the manner in which a state must approve a compact. Therefore, one must consult state law to make this determination.
III. THE ROLE OF STATE LAW
The Michigan Constitution requires that “All legislation shall be by bill and may originate in either house.” Const 1963, art 4, § 22. It further provides that, “No bill shall become a law without the concurrence of a majority of the members elected to and serving in each house.” Const 1963, art 4, § 26. According to the Legislature’s internal rules, concurrent resolutions need be approved only by a majority of those present at the time they are voted on. See Mason’s Manual of Legislative Procedure, § 510(1), p 338.
If only a concurrent resolution is required, the tribal-state gaming compacts were properly approved and are valid. However, if the compacts are legislation, they were not properly approved by the Legislature, because a majority of those elected and serving did not approve them.
While the Michigan Constitution requires that all legislation be passed by bill, it does not define legislation. The dictionary defines “legislation” as “the act of making or enacting laws.” Random House Webster’s College Dictionary (2000). “Law” is defined as “the principles and regulations established by a government or other authority and applicable to a people, whether by legislation or by custom enforced by judicial decision.” Id.
A similar definition is found in Black’s Law Dictionary (6th ed), which describes “legislation” as “[t]he act of giving or enacting laws. .. . Formulation of rule for *344 the future.” “Law” is further defined as “[t]hat which must be obeyed and followed by citizens subject to sanctions or legal consequences .. . .” Id.
These definitions suggest that legislation involves the Legislature’s power to formulate rules applicable to its people. The central characteristic of legislation is the ability of the Legislature to act unilaterally in creating rules applicable to those subject to its power. In Westervelt,[7] a plurality of this Court stated, “[T]he concept of ‘legislation’, in its essential sense, is the power to speak on any subject without any specified limitations.” (Emphasis in original). Where Indian gaming is concerned, the Legislature has no such power. According to IGRA, the Legislature must obtain tribal consent before the tribe will be bound by state law.
The compacts are not legislation. They place no restrictions or duties on the people of the state of Michigan. They create no duty to enforce state laws on tribal lands. Sale of liquor to Indian casinos is subject to the same requirements as sales to other Michigan businesses.
The compacts do not impose duties, responsibilities, and costs on the state. They do not force the state to assume the obligation to oversee and implement the unemployment and worker’s compensation statutes. The compacts merely obligate the tribes to provide the same benefits to their employees as those employees would be entitled to if they worked for an off-reservation business. A representative provision reads:
The tribe shall provide to any employee who is employed in conjunction with the operation of any gaming establishment at which Class III gaming activities are operated *345 pursuant to this Compact, such benefits to which the employee would be entitled by virtue of the Michigan Employment Security Act, and the Worker’s Disability Compensation Act of 1969, if his or her employment services were provided to an employer engaged in a business enterprise which is subject to, and covered by, the respective Public Acts. [Compact with Little Traverse Band Bands of Odawa Indians, § 5. (Internal citations omitted.).]
There is no requirement in that representative provision that the tribe fulfill this obligation through state agencies. It is entirely possible that the tribe has its own system for providing such benefits.
Justice WEAVER claims that the tribes have the authority to tax gaming activity under the IGRA. Opinion of Weaver, J., post at 357. We find the claim to be of no consequence in this case. That tribes may have relinquished certain rights as part of the bargaining process has no effect on the proper characterization of the compacts during review of the Legislature’s actions.
A higher tax is not placed on Indian gaming proceeds. There is no restriction on advertising related to Indian casinos. The compacts do not give special treatment to Indian casino suppliers. No burden is placed on the people of the state of Michigan through the negotiated compacts.
Plaintiffs argue that the compacts mandate the creation of local revenue sharing boards. However, local governments are not obliged to create these boards unless they wish to take advantage of the monetary contribution the tribes have voluntarily agreed to provide. The compacts essentially assign third-party beneficiary status to local governments. In order to accept the benefits of a compact, a local government must comply with the conditions set out in the compact. The *346 compact, however, does not force a local government either to share in the benefits of the compact or to create a local board.
The compacts essentially advise local governments that, to exercise local control over the payments that the compacts obligate the tribes to disburse to them, they must establish a board. The board must be given the authority to accept the payments. The fact that local governments may exhibit rational self-interest and proceed to set up such boards does not render the compacts legislation. Nor does the fact that new businesses will be located on reservations near these communities render the subject of the compacts legislative. Any large business that locates a branch near a small community might increase local governmental expenses due to the enhanced economic activity that the branch occasions.
The compacts are applicable only to the tribes. The tribes are generally not subject to the legislative power of the state. To the extent that the compacts delineate rules of conduct applicable to tribal gaming, they do not do it through the use of the Legislature’s unrestricted power. They do it through the affirmative choice of the tribes. The compacts are government-to-government agreements. Black’s, supra at 6. Each explicitly acknowledges that it is between two sovereigns.
Accordingly, the compacts are not legislation. They are more closely analogous to contracts and have been so treated by other states. The Washington Supreme Court has held that “Tribal-state gaming compacts are agreements, not legislation, and are interpreted as contracts.” See Confederated Tribes of the Chehalis Reservation v Johnson, 135 Wash 2d 734, 750; 958 P2d 260 (1998). See also Confederated Tribes of Siletz Indians of Oregon v Oregon, 143 F3d 481 (CA 9, 1998); Gallegos v Pueblo of Tesque, 132 NM 207, 218; 46 P3d 668 (2002).
*347 As explained previously, the state does not possess the power to apply its law unilaterally to gaming on tribal land. The state and a tribe must negotiate a mutual agreement describing the regulations that may be applied to class III gaming on Indian lands.
The power to legislate is distinct from the power to contract. Whereas, normally, legislation requires only the agreement of a majority of the lawmakers, a contract must have the agreement of all its parties to all its terms. Boerth v Detroit City Gas Co, 152 Mich 654, 659; 116 NW 628 (1908). The compacts explicitly provide that they do not take effect unless all parties, the state and the tribes, agree to them. The compacts are not a product of the unilateral action or unrestricted power of the Legislature, but, instead, result from negotiations between sovereign entities, the state and the tribes.
Because the compacts are not legislation, the Legislature was not required to approve them by bill. In Michigan, the “ ‘legislative authority of the State can do anything which it is not prohibited from doing by the people through the Constitution of the State or of the United States.’ ” Huron-Clinton Metro Auth v Bds of Supervisors of Five Cos, 300 Mich 1, 12; 1 NW2d 430 (1942), quoting Attorney General v Montgomery, 275 Mich 504, 538; 267 NW 550 (1936).
Nothing in the federal or state constitutions prohibits the Legislature from approving intergovernmental agreements by concurrent resolution. The Legislature’s internal rules allow for this form of approval. Negotiated compacts might involve legislation, for example, where they require the state to create a new agency or extend state jurisdictional authority to tribal land. However, the compacts at issue do not involve these concerns.
The Legislature was not restricted in its approval process by IGRA or by the state Constitution. Contrary to *348 Justice MARKMAN’s position,[8] our state Constitution is unlike the federal constitution in this respect: whereas the power of the federal government is provided for and limited by the United States Constitution, the power of state government is inherent in the state. This distinction is well-recognized:
The government of the United States is one of enumerated powers; the national Constitution being the instrument which specifies them, and in which authority should be found to the exercise of any power which the national government assumes to possess. In this respect, it differs from the constitutions of the several States, which are not grants of powers to the States, but which apportion and impose restrictions upon the powers which the States inherently possess. [Cooley, Constitutional Limitations, vol I, p 12.]
There is no provision in the state constitution indicating how the Legislature should address an executive agreement negotiated by the Governor and presented to the Legislature for its approval. Because there was no restriction on its ability to act, the Legislature followed its internal procedure, one that it used when approving compacts that the Governor negotiated in 1993. We conclude that, given the unique nature of tribal-state gaming compacts and the content of the particular compacts at issue, this form of legislative approval was appropriate.
IV SEPARATION OF POWERS
At the time that plaintiffs filed suit, no amendment of the compacts had been made. For that reason, it is arguable that plaintiffs’ separation of powers claim is not ripe for review. If that is the case, plaintiffs’ challenge is a facial challenge only.
*349 To establish that an act is facially unconstitutional, the challenging party must show that “ ‘no set of circumstances exists under which the [a]ct would be valid.’ ” Straus v Governor, 459 Mich 526, 543; 592 NW2d 53 (1999), quoting United States v Salerno, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987). Plaintiffs cannot meet this burden.
The amendment provision of the compacts survives a facial challenge to the Separation of Powers Clause of the Michigan Constitution. Const 1963, art 3, § 2. There are many conceivable amendments that a governor might make to these compacts. For example, a governor could amend the provision relating to dispute resolution or the provision about the timing of payments.
Because there was no amendment to challenge at the time plaintiffs brought suit, arguably the issue is not ripe for review. Admittedly, the jurisprudence in this area is unclear. No controlling state precedent exists regarding when a court is to analyze the ripeness issue. Federal secondary authority suggests that a suit must be ripe when it is instituted: “[t]he doctrines of standing and ripeness focus on aspects of justiciability at the time the action is commenced.” Moore’s Federal Practice, vol 15, §101.05. In addition:
The burden is on the plaintiff to allege in the complaint sufficient facts to establish the court’s jurisdiction. The court will review the issue for ripeness as of the time the litigation is commenced. The matter must have been ripe for review at that time; subsequent ripening... is not sufficient to confer the court with jurisdiction that did not originally exist when the action was initiated. [Id. at § 101.74]
Unfortunately, Moore’s offers no authority for this proposition.
*350 Clearly, during the pendency of this litigation, Governor Granholm made amendments to the gaming compacts at issue. It is argued that these render the issue ripe for this Court’s review. However, the amendments were made after the opinions from the lower courts were released. This Court has consistently declined to entertain constitutional questions where it lacks the benefit of a fully developed lower court record. In re CAW, 469 Mich 192; 665 NW2d 475 (2003); Jenkins v Patel, 471 Mich 158; 684 NW2d 346 (2004).
We may possess jurisdiction to decide the issue. However, the parties addressed the issue only in a cursory fashion, each premising its argument on its characterization of the original compacts as either legislation or contract. Also, the Court of Appeals did not address the issue. Absent a more developed record, in the exercise of judicial restraint, we decline to decide it.
Consistent with our practices, a majority of the Court agrees that the issue whether the Governor’s recent amendments violate the Separation of Powers Clause should be remanded for Court of Appeals consideration.
V LOCAL ACTS PROVISION
Finally, because the compacts at issue are not legislation, they do not violate the local acts provision of the Michigan Constitution. Const 1963, art 4, § 29. We disagree with Chief Justice CORRIGAN’S local acts analysis. The local acts provision reads:
The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question. [Const 1963, art 4, § 29.]
*351 An act is legislation. Black’s Law Dictionary defines a legislative act as: “[a]n alternative name for statutory law. A bill which has been enacted by the legislature into law.” Black’s Law Dictionary (6th ed). Since tribal-state gaming compacts are not legislation, as discussed supra, the local acts provision of our Constitution is not applicable to them.
VI. A RESPONSE TO THE DISSENTS
We are unpersuaded by Justice MARKMAN’s argument which has as its premise that Blank is applicable to the facts of this case. Blank involved a case where the Legislature delegated power to an administrative agency but attempted to retain a legislative veto. 462 Mich at 113. In contrast, the present case involves two separate branches of government approving agreements with sovereign Indian tribes. The question presented is whether the Legislature’s ratification of the agreements by concurrent resolution was the appropriate manner in which to manifest its assent.
The extra-jurisdictional cases that the dissents rely on are distinguishable from the present case. In each, the governor of the state acted unilaterally to bind the state to the compact. While those cases hold that legislative approval is required, no case suggests the form that such approval must take. See State of Kansas ex rel Stephan v Finney, 251 Kan 559; 836 P2d 1169 (1992); Narragansett Indian Tribe of Rhode Island v Rhode Island, 667 A2d 280 (1995). In the present case, the Michigan Legislature expressed its approval of the compacts. The unique question before us is whether that Legislature’s approval was sufficient under the Michigan Constitution. We hold that it was.
Both Justice MARKMAN and Justice WEAVER rely on Becker v Detroit Savings Bank, 269 Mich 432; 257 NW *352 853 (1934). Becker is inapplicable to this case. It dealt with a legislative resolution that purported to convey to the courts the Legislature’s intent in passing a certain law. The Court held that, while the resolution was entitled to “respectful consideration,” it was not the law. Id. at 436. Becker concluded that the courts are bound to apply the law as written. Id.
The question here is not whether the compacts must be followed in light of conflicting statutory authority. It is whether the Legislature was required to voice its approval in the form of a bill that is passed into law. Becker notes that “|j]oint resolutions * * * are often used to express the legislative will in cases not requiring a general law.” Id. at 435, quoting Hoyt v Sprague, 103 US 613, 636; 26 L Ed 585 (1880). Becker does not aid in determining whether the compacts at issue require a general law.
VII. CONCLUSION
A majority of justices, myself included, hold that the tribal-state gaming compacts at issue are not legislation. They are appropriately viewed as agreements between sovereign entities. They do not impose duties on or restrict the people of the state. Instead, they are contractual in nature, conveying the rights and obligations of the parties, the state, and the various tribes. Therefore, a concurrent resolution of the Legislature was appropriate to validate them.
For these reasons, a majority affirms the Court of Appeals decision in favor of defendants, except as to the recent amendments made by Governor Granholm. On that issue, a majority agrees to remand the case to the Court of Appeals for consideration of plaintiffs’ separation of powers claim.
*353 CAVANAGH, J., concurred with KELLY, J.

 Blank v Dep’t of Corrections, 462 Mich 103; 611 NW2d 530 (2000). The Blank plurality adopted the United States Supreme Court’s test regarding legislative veto enunciated in Immigration & Naturalization Service v Chadha, 462 US 919; 103 S Ct 2764; 77 L Ed 2d 317 (1983). 462 Mich at 115.

 I note that 25 USC 2710(d)(8) does not, as Chief Justice CORRIGAN suggests, allow the tribe to go directly to the Secretary of Interior who can then approve the compact. The section simply gives the secretary the authority to approve a gaming compact entered into between an Indian tribe and a state. It does not authorize the secretary to approve a compact to which either side has not manifested its assent. After the Seminole case, the remedy for a tribe is unclear. Before Seminole, it was clear that the remedy was that each side would submit a proposed compact to a mediator, who would choose one of the two. 25 USC 2710(d)(7)(B)(iii). This remedy was available only after issuance of a federal district court *341 order. Id. Because Seminole affirmed a state’s immunity from federal suit, it is unclear if this remedy is still available.

 MCL 431.301 et seq.

 MCL 432.9.

 See MCL 432.201 et seq.

 MCL 432.201 et seq.

 Westervelt v Natural Resources Comm, 402 Mich 412, 440; 263 NW2d 564 (1978) (opinion by Williams, J.).

 Opinion of Markman, J., post at 389.