Lincoln C. ALMOND, in his capacity as Governor of the State of Rhode Island et al.

v.

The RHODE ISLAND LOTTERY COMMISSION, Newport Grand Jai Alai, LLC, and Burrillville Racing Association, d.b.a. Lincoln Greyhound Park et al.

No. 99–525–Appeal.

Supreme Court of Rhode Island.

July 27, 2000.

Sheldon Whitehouse, Attorney General, Elizabeth A. Wallace, James R. Lee, Lauren Sandler Zurier, for Attorney General's Office.

Joseph S. Larisa, Jr., Erika Leigh Kruse, for Lincoln C. Almond.

Karen A. Pelczarski, Providence, for Common Cause of RI.

Deming E. Sherman, Providence, Loretta Smith, for New England Legal Foundation.

Lauren E. Jones, Robert Smith Thurston, Providence, for RI House of Representatives.

Thomas Dickinson, Providence, Jeremiah C. Lynch, III, for Newport Grand Alai.

Laurent L. Rousseau, Newport, Daniel V. McKinnon, Pawtucket, for Lincoln Greyhound Park.

Edward M. Fogarty, for RI Senate.

Robert M. Silva, Middletown, David P. Martland, David C. Potts, Middletown, for Lottery Com'n.

Present: WEISBERGER, C.J., and LEDERBERG, BOURCIER and FLANDERS, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on appeals and cross-appeals from all parties to this litigation, save for the plaintiff intervenor, the Attorney General, from a declaratory judgment entered in the Superior Court along with a denial of a request by the Governor for injunctive relief. We reverse the declaratory judgment and affirm the denial of injunctive relief for reasons which will be set forth below. The facts of the case as found by the trial justice and the

context in which the case began are as follows.

From 1744 until the adoption of a Constitution by the people of Rhode Island in 1843, the General Assembly authorized and supervised a number of lotteries for the purpose of funding a number of public improvements. The lottery was supervised by the General Assembly, certain of whose members were appointed to serve as managers for some of the lotteries, but by the 1820s the General Assembly began to delegate the supervision of lotteries to professional managers. Following the ratification of the Rhode Island Constitution in 1843, new lotteries were prohibited and the use of this method of funding public improvements ended. During the pre-constitutional era, the Legislature regulated every facet and every detail of every lottery that it created.

In 1973, the Constitution of Rhode Island was amended to lift the ban on state-run lotteries. The Constitution, as amended, set forth the following language in article 6, section 15:

"All lotteries shall be prohibited in the state except lotteries operated by the state and except those previously permitted by the general assembly prior to the adoption of this section, *and all shall be subject to the prescription and regulation of the general assembly.*" (Emphasis added.)

In 1974, soon after the 1973 amendment was ratified, the General Assembly enacted a statute that was codified as G.L.1956 § 42–61–1. This statute created a commission that was authorized to manage the lottery. The statute creating the Lottery Commission contained the following language.

"[The commission] shall consist of nine (9) members * * * three (3) of whom shall be members of the senate, not more than two (2) from the same political party to be appointed by the majority leader; three (3) of whom shall be members of the house of representatives, not more than two (2) from the

same political party to be appointed by the speaker of the house; and three (3) of whom shall be representatives of the general public to be appointed by the governor." Section 42–61–1(a).

The trial justice in his factual findings set forth in detail the powers that were delegated by the statute to the Lottery Commission:

"a. Lotteries:

1. The type of lotteries to be conducted;

2. The price of tickets with respect to lotteries;

3. The number and size of prizes on winning tickets;

4. The manner of selecting winning tickets;

5. The manner of payment of prizes to the holders of winning tickets;

6. The frequency of the drawings or selections of winning tickets;

7. The number and types of locations at which tickets may be sold;

8. The method to be used in selling tickets;

9. The licensing of agents to sell tickets;

10. The license fee to be charged to agents;

11. The manner in which the proceeds of the sale of tickets are maintained, reported and/or otherwise accounted for;

12. The manner and amount of compensation to be paid to sales agents necessary to provide for the adequate availability of tickets to prospective buyers and for the convenience of the general public;

13. The apportionment of the total annual revenue accrued from the sale of tickets and from all other sources for the payment of prizes to the holders of winning tickets;

14. For payment of costs incurred in the operation and administration of the

Lottery, including the expense of the Commission and the cost resulting from any contract or contracts entered into for promotional advertising, consulting, or operational services;

15. Or for the purchase or lease of facilities, lottery equipment, and materials; and for the repayment of monies appropriated to the lottery fund;

16. The manner, standards and specification for a process of competitive bidding for Commission purchase and contracts, and;

17. The sale of commercial advertising space on the reverse side or in other available areas upon lottery tickets provided that all net revenue derived from the sale of the advertising space shall be deposited immediately into the state's general fund.

"b. VLTs: [video lottery terminals]

1. The licensing of technology providers capable of interfacing with a central communications systems controlled by the Commission (the award of a license to technology providers must satisfy the requirements of the State Purchasing Laws);

2. Accounting procedures for determining net terminal income from lottery terminals and unclaimed prizes and credits;

3. The type of video lottery game to be conducted;

4. The price to play each game and the prizes or credits to be awarded;

5. Financial reporting procedures for license[d] video lottery retailers and control procedures in the event that any of these retailers should become insolvent;

6. Insurance and binding by (i) licensed video lottery retailers and (ii) technology providers;

7. The licensing of licensed video lottery retailers;

8. Contracting with technology providers;

9. A provision requiring that all VLTs be linked under a central communications system to provide auditing program information as approved by the Lottery, and;

10. Any other matter necessary for VLTs or for the convenience of the public.[1]

"[The commission] * * * has exercised, and does exercise such power.

"The legislation creating the lottery provides for the position of director. The director of lotteries under the applicable statute is appointed by the Governor, subject, however, to confirmation by the Commission, and further, the director of lotteries is removable only by the Commission. By statute, the director of lotteries is vested with certain responsibilities and authority. A review of those statutes specifically § 42–61–4 and § 42–61.2–4 clearly confirm the testimony of Director Aubin to the effect that he works for the nine members of the Commission (see testimony of Director Aubin, page 58, line 3, et seq. August 19, 1999).

"The lottery generated gross revenue in its most recent full fiscal year in the amount of $740,720,000 with net revenues of approximately $639,000,000. Of the gross revenue $548,100,000 represented VLT sales and $192,620,000 represented lottery sales. After deducting all expenses and the payouts to 'successful' lottery and VLT players, and taking into account earnings on investment of lottery funds (handled by the General Treasurer) in the amount of $510,000, the revenue to the state general funds was approximately $135,000,000.

"The lottery is a major business enterprise."

1. The findings of the trial justice relating to specific delegation of power to the Lottery Commission constituted an accurate summary of the powers and duties of the commission as set forth in § 42–61–2 in respect to lotteries and in § 42–61.2–3 in respect to video lottery terminals.

It is undisputed that the statute that created the Lottery Commission and delegated to it the foregoing specific powers was enacted by both Houses of the General Assembly and signed by the Governor in office at that time. The Lottery Commission operated continuously from 1974 until the present under the management of directors appointed by the Governor and approved by the commissioners. A previous director was John P. Hawkins, who also served for a time as the first chairman of the commission. Mr. Hawkins was succeeded by Gerald S. Aubin. Both Mr. Hawkins and Mr. Aubin testified in the Superior Court concerning their duties and the nature of the commission's operation. Another witness was Professor Patrick T. Conley, a noted historian who has written extensively on the constitutional and political history of the State of Rhode Island from its Colonial beginnings to modern times. The trial justice based his findings of fact upon this testimony, as well as extensive documentary evidence presented by the parties.

The present litigation arose as a result of a dispute between the Governor and the commission in respect to the authorization of an increase in the number of video lottery terminals (VLTs) to be allowed at Newport Grand Jai Alai and Lincoln Greyhound Park, which was owned by Burrillville Racing Association, Inc. On April 26, 1999, the Lottery Commission voted five to four to authorize this increase despite the opposition of the Governor, who appeared at a meeting of the commission to oppose the proposal to increase the number of VLTs. Those commissioners who voted in favor of the expansion were members of the Legislature who had been appointed either by the Speaker of the House of Representatives or by the Majority Leader of the Senate. Those voting against the additional VLTs were the three persons appointed by the Governor, who were joined by one member of the Legislature.

Shortly after the vote was recorded, but before the additional authorized machines were installed, the Governor brought this action for declaratory judgment and sought injunctive relief against the implementation of the commission's vote. In the course of the litigation, the owners and operators of the Newport Grand Jai Alai and of Lincoln Greyhound Park were added as defendants in this action. The Senate and the House of Representatives intervened as parties defendant. The Governor was joined as a party plaintiff—intervenor by the Attorney General. The parties agreed that pending a hearing on the preliminary injunction, the commission would refrain from implementing its vote to increase the number of VLTs. A preliminary injunction was issued by a justice of the Superior Court. This preliminary injunction was vacated following the issuance of an opinion by this Court in *In re Advisory Opinion to the Governor (Rhode Island Ethics Commission—Separation of Powers)*, 732 A.2d 55 (R.I.1999).

Thereafter, the Superior Court conducted evidentiary hearings during the month of August 1999 and received memoranda of law from each of the parties plaintiff and defendant in this litigation. During the course of the litigation, the Lottery Commission implemented its April 26, 1999 vote, and the Superior Court denied the Governor's further request for a preliminary injunction.

At the conclusion of the litigation, the trial justice found as a fact and held as a matter of law that plaintiffs' argument based upon separation of powers must fail. He based this holding upon our opinion in *Narragansett Indian Tribe of Rhode Island v. State*, 667 A.2d 280, 281 (R.I.1995), wherein we held that exclusive authority over lotteries is and always has been vested in the General Assembly either by Royal Charter or by Constitution. We went on to hold, as recognized by the trial justice, that the Executive Department had no claim to any constitutional power with respect to lotteries and further that the Governor lacked any implied powers with respect to lotteries. The trial justice went

on to state: "Accordingly, this Court is constrained to and does find that the plaintiffs' traditional separation of powers argument must fail."

The trial justice then proceeded to craft a somewhat ingenious doctrine that held in substance that an administrative agency composed of a majority of legislators could not manage and regulate the lottery without submitting each rule or regulation for approval to both Houses of the Legislature (bicameralism) and presenting each such rule or regulation to the Governor for his assent or veto (presentment). The trial justice observed with complete accuracy: "There is no question * * * that in connection with actions and votes at the Lottery Commission, none of the foregoing occurs." This theory was derived by analogy from the United State Supreme Court's opinion in *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). We shall analyze this case in detail later in this opinion. We believe that it has no persuasive effect upon our determination of the issues raised in this litigation.

He then determined that the Lottery Commission, in exercising legislative power without the constraints of bicameralism and presentment, unconstitutionally had delegated its power to this commission by virtue of the fact that it was composed of a majority of members appointed by the House Speaker and the Senate Majority Leader. Having found that this delegation of power to this commission as so composed was unconstitutional, he entered declaratory judgment to that effect, but denied the Governor's request for injunctive relief and stayed his judgment until July 1, 2000, in the expectation that this Court would have reviewed his decision before that time. We later extended the stay until further order of this Court.

■ We must respectfully disagree with the decision of the trial justice insofar as he held that the delegation of power to this commission was unconstitutional. We do agree with the trial justice that, based

on our holding in *Narragansett Indian Tribe,* the regulation of the lottery by the General Assembly did not violate the principle of separation of powers under the Rhode Island Constitution. The trial justice was completely correct in finding as a fact and holding as a matter of law that the Constitution placed the regulation of state-run lotteries entirely in the hands of the General Assembly without giving any role to the Governor. Such participation as was accorded to the Governor was given by reason of legislative delegation of such power so that the Governor was authorized to appoint three members of the commission and also to nominate the director subject to the approval of the members of the commission. This role was conferred by the Legislature and not by the Constitution.

## Delegation of Power to the Commission

This Court has held on numerous occasions that "limited portions of the legislative power, if confined in expressly defined channels, may be vested by the general assembly in other bodies which it authorized to act as its agents or auxiliaries in carrying out its constitutional duties." *Milardo v. Coastal Resources Management Council of Rhode Island,* 434 A.2d 266, 270 (R.I.1981) (quoting *Opinion to the Governor,* 88 R.I. 202, 205, 145 A.2d 87, 89 (1958)). In *Milardo,* we synthesized our case law on the subject of delegation of authority by the General Assembly to administrative agencies in the following terms:

"Although we have interpreted our State Constitution to forbid unconditional delegation of legislative power, *see City of Warwick v. Warwick Regular Firemen's Association,* 106 R.I. 109, 113, 256 A.2d 206, 209 (1969), we have also recognized the need for administrative expertise in the discharge of certain legislative functions. *Davis v. Wood,* R.I., 427 A.2d 332, 335–36 (1981); *J.M. Mills, Inc. v. Murphy,* 116 R.I. 54, 61, 352 A.2d 661,

665 (1976); *see State v. Peloquin,* R.I., 427 A.2d 1327, 1330 (1981). Indeed, we have long been mindful of the notion expressed by the North Carolina Supreme Court that

> 'the problems which a modern legislature must confront are of such complexity that strict adherence to ideal notions of the non-delegation doctrine would unduly hamper the General Assembly in the exercise of its constitutionally vested powers.' *Adams v. North Carolina Department of Natural & Economic Resources,* 295 N.C. 683, 696–97, 249 S.E.2d 402, 410 (1978).

*Cf. South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646, 677 (1st Cir.1974) (agency must have flexibility; Congress cannot acquire sufficient information to manage detailed process of enforcement).

"Thus, this court has acknowledged that 'limited portions of the legislative power, if confined in expressly defined channels, may be vested by the general assembly in other bodies which it authorized to act as its agents or auxiliaries in carrying out its constitutional duties.' *Opinion to the Governor,* 88 R.I. 202, 205, 145 A.2d 87, 89 (1958).

"In sum, the delegation of legislative functions is not a per se unconstitutional action. Instead, it is the conditions of the delegation—the specificity of the functions delegated, the standards accompanying the delegation, and the safeguards against administrative abuse— that we examine in determining the constitutionality of a delegation of power. *See Davis v. Wood,* R.I., 427 A.2d 332, 335–36 (1981); *De Petrillo v. Coffey,* 118 R.I. 519, 524, 376 A.2d 317, 319 (1977); *J.M. Mills, Inc. v. Murphy,* 116 R.I. 54, 61, 352 A.2d 661, 665 (1976); *Jennings v. Exeter–West Greenwich Regional School District Committee,* 116 R.I. 90, 98, 352 A.2d 634, 638–39 (1976); *City of Warwick v. Warwick Regular Firemen's Association,* 106 R.I. 109, 118, 256 A.2d

206, 211 (1969). *See generally A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 551, 55 S.Ct. 837, 852, 79 L.Ed. 1570, 1591 (1935) (Cardozo, J., concurring) (delegation permissible when 'canalized within banks that keep it from overflowing'); *Panama Refining Co. v. Ryan,* 293 U.S. 388, 421, 55 S.Ct. 241, 249, 79 L.Ed. 446, 459 (1935) (despite need for wide range of administrative flexibility, constitutional system requires limitation).

"In *Davis v. Wood* and *J.M. Mills, Inc. v. Murphy,* both *supra,* we upheld delegations that provided general directions to the administrative agencies. By enunciating sufficiently intelligible standards, the Legislature had adequately guided the actions of the administrative agencies." *Milardo,* 434 A.2d at 270–71.

■ Applying the foregoing principles to the delegation by the General Assembly to the Lottery Commission of power to control and manage the state-run lottery in all its manifold aspects, we are constrained to conclude that this delegation provided specific and detailed guidelines within which the Lottery Commission should perform its functions. Certainly in the words of Justice Cardozo, the authority of the Lottery Commission has been "canalized within banks that keep it from overflowing." It would be hard to conceive of a delegation of authority to an administrative agency that was more specific in its terms and conditions than those provided by the General Assembly in respect to the Lottery Commission.

Moreover, the nature and scope of the duties of the Lottery Commission are such as to demand that the Legislature be permitted to delegate authority to operate such a massive enterprise. To suggest that such an administrative agency could carry out its functions if it were required to submit each rule, regulation, and vote back to the General Assembly for approval by each House and assent by the Governor would be to foredoom the agency to impo-

tence and futility. No administrative agency could exist under such constraints.

We recognize that the trial justice placed this disability upon the commission only because its membership consisted of a majority of legislators appointed by the Speaker of the House and Majority Leader of the Senate. Consequently, having rejected the separation of powers argument presented by the Governor and the Attorney General, the trial justice in effect took the position that no workable commission consisting of a majority of legislators could be delegated an essentially legislative power for the purpose of managing an enterprise that the Constitution specifically entrusted to the General Assembly, as opposed to the Executive Department. If we were to confirm this holding, we would in effect render the ability of the Legislature to delegate its power to a commission nugatory unless the Legislature appointed members of the committee in accordance with the dictates of the Judiciary. We believe that such judicial intervention would frustrate the expressed will of the framers of the constitutional amendment of 1973 as ratified by the people of this state.

■ Without indulging in a reprise of our analysis of the separation of powers doctrine, which the trial justice has properly held to be inapplicable to this case, we shall observe only that the power to regulate lotteries specifically has been bestowed by the Constitution upon the General Assembly. It is not our function to supervise the General Assembly in its exercise of this power. It is not our function to direct the General Assembly in respect to the wisdom of its method of appointment of members of a commission to which it has delegated the specific management of this enterprise. Neither the Governor nor this Court has been given the power to supervise the General Assembly's implementation of its authority to regulate lotteries in this state. Certainly it is not the function of this Court to pass upon the wisdom of the operation of the Lottery Commission nor to substitute its judgment in respect to the administration of this enterprise.

We stated in our recent advisory opinion, *In re Advisory Opinion to the Governor (Rhode Island Ethics Commission— Separation of Powers)*, 732 A.2d 55, 72–73 (R.I.1999), that it would be necessary for us to determine whether legislators might be appointed to serve on boards and commissions on a case-by-case basis. It was for this reason that we declined to answer questions two and three propounded to us by the Governor.

■ Applying such an analysis to the case at bar, we must determine from the text of the Constitution that this is a *legislative*, not an executive, power to implement. The Governor and the Attorney General seem to concede this in their briefs. Consequently, we perceive no basis for holding that the Legislature may not provide by statute for the creation of a commission consisting of a majority of members appointed from both Houses of the General Assembly with or without including representation from gubernatorial appointees. We conclude that there is no inhibition against the delegation of a portion of the General Assembly's power to such a commission, subject to appropriate guidelines set forth in the enabling legislation.

Our dissenting colleague has written a lengthy and interesting essay on political science. This essay views the structure of the Rhode Island government through the lens of a framer of the Constitution of the United States or as perceived by a member of the convention of 1787 that produced this splendid document. We might find the essay to be persuasive if we were members of a convention assembled to revise the Constitution of the State of Rhode Island. However, this Court is not the equivalent of a constitutional convention. We are not privileged to second-guess those delegates to a constitutional convention who drafted the provision relating to

the supervision of lotteries in the State of Rhode Island and who reposed the power of supervision and regulation of lotteries in the General Assembly. We are not privileged to second-guess the delegates to the constitutional convention that produced the revised Constitution of 1986. We must accept their work product as it was ratified by the people of this state.

It is not helpful to follow selective quotations from the landmark case of *G. & D. Taylor & Co. v. Place*, 4 R.I. 324 (1856). However, if our colleague wishes to rely upon the great words of Chief Justice Samuel Ames, he should not depend wholly on what the Chief Justice had to say about the limitations of the Constitution of 1843 upon exercise of the judicial power by the Legislature. It would be much more pertinent if he would consider the observations of Chief Justice Ames concerning the executive power as he determined it to be affected by the then recently adopted Constitution of 1843. Although Chief Justice Ames quoted the *Federalist Papers* and Alexander Hamilton in relation to the judicial power, he made the following statement in relation to the executive power: *"the executive power had been nominal, merely, under the charter; and the constitution extends it very little. No jealousy of it, or of its assumption by the enterprising and all absorbing legislative department of the government, did, or could, exist."* 4 R.I. at 349–51. (Emphasis added.)

The great bulk of the opinion was dedicated to Chief Justice Ames's establishment of the proposition that the new (1843) Constitution had vested the judicial power in the Supreme Court and such inferior courts as might be from time to time established by the Legislature. Our dissenting colleague will find very little in *Taylor v. Place* to support his argument relating to the *tripartite* separation of powers.

We know that our dissenting colleague regards the Rhode Island Constitution, however erroneously, as a mirror image of the Federal Constitution. Obviously, for reasons that we expounded in detail quite recently in *In re Advisory Opinion to the Governor (Rhode Island Ethics Commission—Separation of Powers)*, 732 A.2d 55 (R.I.1999), we strongly disagree.

Nevertheless, following his mirror image theory, our colleague cites liberally from the majority opinion in *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). We acknowledge the holding in *Chadha*, but strongly believe that it has little persuasive effect upon the instant controversy. Rather than quoting excerpts from the majority opinion, it might be helpful to consider the issue raised by the facts in *Chadha*.

Chadha was an East Indian who was a native of Kenya and held a British passport. He was lawfully admitted to the United States on a nonimmigrant student visa. The visa expired on June 30, 1972. On October 11, 1973, the district director of the Immigration and Naturalization Service (INS) ordered Chadha to show cause why he should not be deported for having remained in the United States longer than his visa permitted. When he appeared before an immigration judge, he admitted that he had overstayed his visa, and he was given an opportunity to file an application for suspension of deportation pursuant to § 244(a)(1) of the Immigration and Nationality Act (Act), formerly codified as 8 U.S.C. § 1254(a)(1).

This Act provided in pertinent part that the Attorney General might in his discretion suspend deportation of an alien who had been lawfully admitted and who had been in the United States for a continuous period of not less than seven years and was able to show that he was of good moral character and whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien.

After hearing, an immigration judge on June 25, 1974, ordered that Chadha's deportation be suspended. The immigration

judge found that he had met the requirements of § 244(a)(1). He, therefore, suspended the deportation proceedings and, in accordance with § 244(c)(1) of the Act, formerly codified as 8 U.S.C. § 1254(c)(1), he forwarded a complete and detailed statement of the facts and pertinent provisions of law to both Houses of Congress. Under § 244(c)(2) of the Act, formerly codified as 8 U.S.C. § 1254(c)(2), either House had the right to veto the Attorney General's determination that the alien not be deported. If within the time limited by the statute neither the Senate nor the House of Representatives should pass a veto resolution, the Attorney General would then cancel deportation proceedings. After approximately one and one-half years (but within the time limited by the statute) the House of Representatives, pursuant to a resolution recommended for passage by the House Judiciary Committee and after review of 340 cases considered by the committee, determined that Chadha and five others did not meet the statutory requirements. The House then passed without debate or recorded vote, a resolution vetoing the Attorney General's suspension of deportation.

After seeking an administrative review without success, Chadha filed a petition for review of the deportation order in the United States Court of Appeals for the Ninth Circuit. The Court of Appeals held that the House of Representatives was without constitutional authority to order Chadha's deportation and, therefore, directed the Attorney General to cease and desist from taking any steps to deport this alien based upon the House resolution. INS sought review in the Supreme Court by appeal and petition for certiorari from the judgment of the Court of Appeals. Interestingly enough, INS agreed with the decision of the Ninth Circuit even though it sought review by the Supreme Court.

On this set of facts, a majority of the Court, in a decision written by Chief Justice Burger, held that a single House of the Congress could not enact a resolution vetoing an act by the Attorney General based upon power delegated to him by the Congress. The majority held that this was a legislative act that would be valid only if passed by both Houses of the Congress (bicameralism) and presented to the president for his approval (or if vetoed by the necessary supermajority to override the veto).

It should be carefully noted that this action by the House of Representatives was in the form of a resolution enacted by the full House. It was not an action taken by an administrative agency to which power had been delegated. It should also be noted that by this opinion the Supreme Court invalidated nearly 200 other statutory provisions in which Congress had reserved a legislative veto.

Justice Powell concurred in the judgment. He took the position that Congress had not violated the principle of bicameralism and presentment, but by acting upon the case of an individual, effectively had usurped the judicial power. Therefore, he did not adopt the reasoning of the majority. *See Chadha*, 462 U.S. at 959–67, 103 S.Ct. at 2788–92, 77 L.Ed.2d at 350–55 (Powell, J., concurring in the judgment).

Justice White in dissent defended the legislative veto but more significantly pointed out the enormous importance of the numerous administrative agencies that carry out and implement the myriad of powers delegated to them by statute. *See id.* at 967–1003, 103 S.Ct. at 2792–2811, 77 L.Ed.2d at 355–77 (White, J., dissenting). He observed that the Court's holding in *Chadha* ignored the accepted doctrine that legislative authority is routinely delegated to the executive branch, to independent regulatory agencies, and to private individuals and groups. He quoted Justice Jackson for the proposition that "[t]he rise of administrative bodies probably has been the most significant legal trend of the last [19th] century." *Id.* at 983, 103 S.Ct. at 2801, 77 L.Ed.2d at 365–66 (White, J., dissenting) (quoting *Federal Trade Commission v. Ruberoid Co.*, 343 U.S. 470, 487,

72 S.Ct. 800, 810, 96 L.Ed. 1081, 1094 (1952) (Jackson, J., dissenting)). He pointed out the obvious fact that legislative power can be exercised by independent agencies and executive departments without the passage of new legislation. Such rule-making power, when properly exercised, creates a body of law that has all the same force and effect as duly adopted legislation without the necessity of an enactment by Congress and approval by the President.

In the case at bar, the General Assembly enacted a statute by concurrence of both Houses and approval of the Governor that created the Lottery Commission. Our dissenting colleague undoubtedly will raise the cry that this agency is not independent because it has a majority of members who are legislators. For that same reason although it contains some individuals appointed by the Governor, it is not an executive agency. The short answer to this argument is that nothing in the Rhode Island Constitution prohibits the appointment of legislators or their designees to an administrative agency to which the Legislature has delegated a portion of its power to administer and regulate lotteries in this state. We must also be reminded that the Rhode Island Legislature (unlike the Federal Congress) need not look to the state Constitution as a source of authority by virtue of its historical plenary power (preserved in both the 1843 and 1986 Constitutions). It may exercise any power unless prohibited in this Constitution. *See Kass v. Retirement Board of the Employees' Retirement System of Rhode Island,* 567 A.2d 358, 361 (R.I.1989). The Rhode Island Constitution does not prohibit the appointment of legislators to administrative boards and commissions. These boards and commissions, once appointed pursuant to valid legislative enactments in which the principles of bicameralism and presentment have been fulfilled, then may exercise all the powers that administrative agencies have tradi-

tionally exercised in both the federal and state systems of government.

It must be emphasized that the trial justice and the parties concede that the Constitution of this state specifically has placed the regulation and supervision of lotteries in the General Assembly and not in the executive. All parties agree that there is no separation of powers issue in this case and the claim of violation of the principle of separation of powers must fail. Consequently, there is no inhibition against the delegation of the General Assembly's constitutional power to an administrative agency. This issue was not even considered by the majority of the Court in *Chadha.* Justice White was the only member of the Court who considered the effect of the decision upon administrative agencies. He pointed out unequivocally that the Congress had the power by appropriate legislation to delegate portions of its authority to administrative agencies. The Lottery Commission is an administrative agency created by legislation passed by both Houses of the General Assembly and signed by Governor Philip Noel. Our dissenting colleague expresses some criticism of Governor Noel for having signed such legislation. We do not believe that Governor Noel could be characterized by anyone, including our colleague, as a "shrinking violet." To suggest that an administrative agency could not exercise its functions without in each case having from the General Assembly specific approval through bicameralism and presentment would be to doom all administrative agencies to impotence. We are not persuaded by *Chadha* or by text writers that our Constitution mandates such a draconian result.

Just as we stated in the advisory opinion to the Governor on separation of powers, we are not interpreting the Constitution of the United States. We are interpreting a specific provision of the Rhode Island Constitution that squarely placed the power to regulate the state lottery in the hands of the General Assem-

bly. The appointment of certain members of the General Assembly to a commission or administrative agency created by the General Assembly in full compliance with the principle of bicameralism and presentment to manage and oversee the complex operation of the state lottery violates no mandate of our Constitution.

### Conclusion

For the reasons stated, the defendants' appeal is sustained and the Superior Court declaratory judgment is hereby reversed. The portion of the judgment that denied injunctive relief to the plaintiffs is affirmed. The papers in the case are remanded to the Superior Court with directions to enter judgment in favor of the defendants.

Justice GOLDBERG did not participate.

FLANDERS, Justice, dissenting.

I respectfully dissent. My colleagues in the majority contend that "[i]t is not our function to supervise the General Assembly in its exercise of this power [to regulate lotteries]" because "[n]either the Governor nor this Court has been given the power to supervise the General Assembly's implementation of its authority to regulate lotteries in this state." But we are the State Constitution's whistleblowers. "[O]ur proper office," as Chief Justice Ames put it in the seminal case of *G. & D. Taylor & Co. v. Place*, 4 R.I. 324, 341 (1856), is "resisting and restraining unconstitutional assumptions of power," *id.,*— especially those assumed by the General Assembly "because it so much *needs* constitutional control." *Id.* at 355. Indeed,

> "it is only because it so much *needs* constitutional control, that the doubt arises whether the constitution *does* control it. Strong as it is, however, it is, alike with the other departments of the government, powerless before the constitution, and the will of the people which that instrument expresses. *The constitution was set up by the people to bound the enterprise of its ambition; to limit the sphere of its activity; to rescue, through the aid of the judicial department, the powers of that and the [executive] department of the government from the eddying current of its 'impetuous vortex.'* This [C]ourt construes the same form of language in the constitution,* when applied to the judicial department, to give exclusive judicial power, *as when applied,* in the same instrument, *to the legislative department, to give exclusive legislative power;* and sees, in the natural enterprise and force of this latter department, nothing but a necessity for the control, with the administration of which, the [C]ourt is, by the constitution, entrusted."* Id.* (First and second emphases in original.)

Thus, if the General Assembly, the Governor, or anyone else has violated our constitution in a case properly before us, "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60, 73 (1803) (Marshall, C.J.), and thereby "to control the tendency to excess of action in every other department." *Taylor*, 4 R.I. at 347. And so, instead of wringing our hands and professing how powerless we are to oversee the General Assembly's implementation of its lottery-regulation powers, we should "start with the premise that legislatures are the creatures of the constitution. They owe their existence to it and derive their powers from it. It is their commission. Therefore *all their acts must be conformable to it or else they will be void.*" *City of Providence v. Moulton*, 52 R.I. 236, 241, 160 A. 75, 77 (1932). (Emphasis added.) For this very reason, our own constitution expressly provides that "[t]his Constitution shall be the supreme law of the state, and *any law inconsistent therewith shall be void.*" R.I. Const. art. 6, sec. 1. (Emphasis added.) Obviously, this constitutional injunction applies to laws passed by the Legislature, as well as to the actions of any agency, commission, or other government entity. *Cf. Metropolitan*

*Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 269, 111 S.Ct. 2298, 2308, 115 L.Ed.2d 236, 254–55 (1991) (holding that a board of federal legislators appointed by local government authorities necessarily exercised sufficient governmental power as an agent of Congress to violate the federal separation-of-powers doctrine). Accordingly, even though the constitution has specifically bestowed the power to regulate lotteries upon the General Assembly, it is our function, as this state's highest court, to determine whether it has implemented that power in a manner that is consistent with our constitution. If it has not, then the General Assembly's attempt to regulate lotteries in this case "shall be void," R.I. Const. art. 6, sec. 1, and we not only have the power but the duty to exercise the "necessity for the control" over "the natural enterprise and force of this [legislative] department * * * with the administration of which, the court is, by the constitution, entrusted." *Taylor,* 4 R.I. at 355.

Under a tripartite system of distributed government powers like the one we have here in Rhode Island, it is hornbook constitutional law that the Legislature "may not delegate power to parts of itself *whether or not* an exercise of that delegated power is deemed a 'legislative act.' " Laurence H. Tribe, 1 *American Constitutional Law,* § 2–5 at 145 (3d ed.2000) (hereinafter *Constitutional Law* ). Moreover, "a quasi-parliamentary form of government in which [the Legislature] delegates *any* power to itself or its parts—even legisla-

tive power—is inconsistent with the most fundamental architecture of the Constitution." *Id.* at 140. Thus, the General Assembly cannot delegate its article 6, section 15, power to regulate and proscribe[2] lotteries to the Senate or to the House of Representatives alone, to some legislative committee thereof, or to an agency like the Lottery Commission that is controlled by legislators or their surrogates. Such a delegation is impermissible under our constitution because it allows a part of the whole to accomplish what the constitution allows only the whole Legislature to do. Indeed, what is even worse, it allows a small subgroup of the General Assembly to regulate lotteries without satisfying our State Constitution's "single, finely wrought and exhaustively considered" safeguards of bicameralism, presentment, and keeping a public journal of all legislative proceedings—that is, without complying with the very constitutional hurdles that the General Assembly must clear before it can pass laws, votes, or resolutions pertaining to lotteries. *See Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 951–52, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317, 344–45 (1983) (holding that any action taken by a subpart of the Legislature that is legislative in "character," must be taken in accord with the "single, finely wrought and exhaustively considered, procedure[,]" set forth in the explicit and unambiguous bicameralism and presentment provisions in Article I of the Federal Constitution that are also present in our State Constitution).[3]

---

**2.** The General Laws version of the State Constitution indicates that lotteries are subject to the "prescription" and regulation of the General Assembly, but the text of the actual constitutional amendment that the voters approved in 1973 provided for the "proscription" and regulation of lotteries by the General Assembly. *Compare* R.I. Const. art. 6, sec. 15, provided in G.L.1956 *with* Constitutional Convention of Rhode Island 1973, Final Approval (located at C# 00521 of Constitutional Convention Records, 1973—R.I. State Archives Office). But the precise wording of the lottery amendment is immaterial to the outcome in this case. Un-

der either version, the General Assembly is free to proscribe or prescribe state-run lotteries as long as it follows the constitution's restrictions on how it must do so, including passage of lottery laws pursuant to the bicameralism, presentment, and public journal prerequisites to valid legislative action and/or assigning a portion of its responsibility to regulate lotteries to nonlegislative entities and officials but not to some subpart of itself or to an entity controlled by legislators.

**3.** *See* R.I. Const. art. 6, sec. 2 ("[t]he concurrence of *the* two houses shall be necessary to the enactment of laws") (emphasis added);

These constitutional restrictions on the General Assembly's ability to delegate its lottery-regulation powers to an administrative agency or commission comprised of a majority of sitting legislators are not "the dictates of the judiciary," as the majority would have it, but rather, they are the dictates of the people of Rhode Island as they have embodied them in our State Constitution.[4] Thus, our affirmance of the Superior Court's judgment in this case would not render nugatory the General Assembly's ability to delegate its lottery-regulation powers to a typical governmental commission or agency comprised of a majority of nonlegislators. Rather, the General Assembly would be barred only from self-delegating its power to legislator-dominated entities like the present Lottery Commission because they are not "other bodies" to whom legislative powers can be delegated, *see Milardo v. Coastal Resources Management Council of Rhode Island*, 434 A.2d 266, 270 (R.I.1981) (emphasis added), but subparts and constituent elements of the General Assembly itself.

> and art. 9, sec. 14 ("[e]very bill, resolution, or vote * * * which shall have passed both houses of the general assembly shall be presented to the governor [for his or her approval or veto]").

**4.** Because our State Constitution contains bicameralism and presentment restrictions similar to those that were first included in the Federal Constitution,

> "it is helpful to recall the context that gave rise to the inclusion of bicameralism and presentment in the [Federal] Constitution. Adopted in an era when many had lost confidence in the capacity of (unchecked) legislatures to safeguard liberty and respect law, the constitutional checks of bicameralism and presentment, codified in Article I, Section 7, comprised a key element of the Constitution's scheme to preserve individual liberty. Those requirements serve evident and well-understood purposes, which require only brief mention here. First, by dividing the legislative power between two chambers, bicameralism and presentment make it more difficult for factions to

Furthermore, however broad the General Assembly's legislative powers may be with respect to the regulation of lotteries, it has no power under our State Constitution to execute the laws. Because the power to execute the laws has been distributed to the executive department of our state government, the constitution thereby prohibits the Legislature from exercising this power. "The constitutional distribution of the powers of [Rhode Island's state] government is at once a grant of specific power to each department and a prohibition to the other two with reference to that same power." *Creditors' Service Corp. v. Cummings*, 57 R.I. 291, 300, 190 A. 2, 8 (1937). By vesting a controlling subpart of the Legislature—namely, the six legislator members of the nine-member Lottery Commission—with the power to execute the same votes, resolutions, and regulations that they pass with respect to lotteries, the General Assembly has violated this fundamental structural limitation embedded in our State Constitution because "[a] primary separation-of-powers concern * * * is that power both to enact and to execute laws not be lodged in the

> usurp legislative authority, ensuring a diffusion of governmental power and preserving the liberty and security of the governed. In this regard, the division of legislative power into distinct parts effectively operates 'to balance interest against interest, ambition against ambition, the combinations and spirit of dominion of one body against the like combinations and spirit of another.' Second, the requirements of [bicameralism and presentment] promote caution and deliberation; by mandating that each piece of legislation clear an intricate process involving distinct constitutional actors, bicameralism and presentment reduce the incidence of hasty and ill-considered legislation. Third, by relying on multiple, potentially antagonistic constitutional decisionmakers, the legislative process prescribed by [bicameralism and presentment] often produces conflict and friction, enhancing the prospects for a full and open discussion of matters of public import." John F. Manning, *Textualism As A Nondelegation Doctrine*, 97 Colum. L.Rev. 673, 708–09 (1997) (footnotes and citations omitted).

same hands." *Constitutional Law,* § 2–5 at 140 n. 25.

And the mere fact that the present Governor appeared before the Lottery Commission to urge it not to increase the number of video-lottery terminals (VLTs) [5] and that a previous Governor may have endorsed the idea of a Lottery Commission— or was once foolish, pliant, or weak enough not to veto the General Assembly's attempt to create such a legislator-dominated agency [6]—cannot possibly be invoked to ward off any later constitutional objection to such an arrangement. Otherwise, once the General Assembly succeeds in enacting a law that will allow it in the future to make an end run around the presentment, public journal, and bicameralism requirements of the constitution—even if it does so by overriding the veto of the Governor—it is then home free constitutionally to legislate away forever after through whatever legislator-dominated entity or subgroup it has empowered for this purpose without satisfying the otherwise applicable requirements of the constitution for enacting such legislation. But, as the United States Supreme Court held in *Chadha* and *Metropolitan,* this game cannot be played consistent with a constitution containing bicameralism and presentment limitations on the attempted exercise of legislative powers by any subgroup of the Legislature.

Here, the General Assembly has empowered the Lottery Commission not only to enact laws and pass votes and resolutions relating to lotteries without satisfying the bicameralism (article 6, section 2), public journal (article 6, section 8), and presentment requirements (article 9, section 14) of our State Constitution, but also to execute these same laws, votes, and resolutions.[7] In *Chadha,* the United States Supreme Court explained that the Federal Constitution's presentment (Article I, section 7, clause 2) and bicameralism requirements (Article I, sections 1 and 7) constitute crucial structural restraints on the "hydraulic pressure inherent within [the Legislature] to exceed the outer limits of its power." *Chadha,* 462 U.S. at 951, 103 S.Ct. at 2784, 77 L.Ed.2d at 345. Thus, it reasoned, if the separation of powers provided for in the Federal Constitution was to function as more than " 'an abstract generalization,' " *id.* at 946, 103 S.Ct. at 2781, 77 L.Ed.2d at 341, the courts must enforce the bicameralism and presentment requirements not only when the Legislature *purports* to act legislatively but whenever it takes action that must be deemed "legislative." *Id.* at 952, 103 S.Ct. at 2784, 77

---

**5.** In doing so, the Governor did not seek to acquire nor did he acquire rights before an administrative agency that would preclude a collateral attack on the constitutionality of the Lottery Commission's enabling legislation. *Cf. Wellington Hotel Associates v. Miner,* 543 A.2d 656, 659 (R.I.1988) (also citing *Easton's Point Association v. Coastal Resources Management Council,* 522 A.2d 199 (R.I.1987), in denying a litigant's right to challenge the agency's enabling legislation because it had acquired rights in a proceeding before the agency). On the contrary, the Governor merely lobbied the commission in his capacity as the state's chief executive officer to avoid taking the very acts that he believed were unconstitutional. Thus, in doing so he has not waived any right to challenge either the commission's actions or its enabling legislation because both actions were perfectly consistent with one another.

**6.** Although the majority may be correct in stating that former Governor Noel "could

[not] be characterized by anyone * * * as a 'shrinking violet,' " nevertheless this former chief executive officer of our state soon rued the day when he failed to veto the legislation creating the Lottery Commission. *See* M. Charles Bakst, "Noel Moves to Take Direct Control of Lottery," The Providence Journal, July 25, 1974, at A1 (quoting Governor Noel as having "declared he made a 'mistake' in signing the law establishing the lottery commission").

**7.** The commission exercises legislative power insofar as it passes votes, resolutions, and rules that regulate and/or proscribe lotteries. It exercises executive power insofar as it carries out and administers such legislative acts. Thus, the commission's vote expanding the number of video lottery terminals (VLTs) in Newport and Lincoln and its implementation thereof partakes of both powers.

L.Ed.2d at 345. The Court deemed the one-house legislative veto of Chadha's status as a permanent resident alien to be a legislative act because it "had the purpose and effect of altering the legal rights, duties, and relations of persons * * * outside the Legislative Branch." *Id.* And because both houses of Congress failed to approve the legislative veto in *Chadha* and failed to present the veto to the President for his approval or rejection, it followed inexorably that it was unconstitutional. *Id.* at 959, 103 S.Ct. at 2788, 77 L.Ed.2d at 350. Indeed, the lack of any presentment requirement alone would itself have been enough to doom the action in question. *See United States Senate v. Federal Trade Commission,* 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1403 (1983) (*FTC*). In *FTC,* the Court summarily affirmed the lower court's judgment invalidating a two-house legislative-veto provision, a device that obviously satisfied the bicameralism requirement but not the presentment obligation that applies to all legislative actions not expressly exempted therefrom by the Federal Constitution. *Id.* at 1216, 103 S.Ct. at 3557, 77 L.Ed.2d at 1403.

In this case, the commission's vote to increase the number of VLTs in Lincoln and in Newport suffers from the same fatal defects as invalidated the one-house veto in *Chadha.* Instead of a one-house legislative veto, the votes of just five legislators in this case "had the purpose and effect of altering the legal rights, duties, and relations of persons * * * outside the Legislative Branch." *Chadha,* 462 U.S. at 952, 103 S.Ct. at 2784, 77 L.Ed.2d at 345. Significantly, the *Chadha* Court held that the House of Representatives' veto of the decision to suspend Chadha's deportation had to be deemed legislative because, without its exercise, Chadha would have remained in America, and any change in his legal status as a resident alien could have

been wrought only by legislation requiring his deportation. *Id.* at 953–54, 103 S.Ct. at 2785, 77 L.Ed.2d at 346. Here, too, but for the votes of the five legislators who authorized the VLT increase, any change in their legal status could have been wrought only by legislation. *See also Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), (invalidating a provision in the federal Balanced Budget and Emergency Deficit Control Act of 1985, 2 U.S.C. §§ 901 to 922, popularly known as the "Gramm–Rudman–Hollings Act," that delegated power to the Comptroller General to forecast the budget deficit and to order the budget cuts necessary to bring federal spending within the act's ceiling, 478 U.S. at 734, 106 S.Ct. at 3192, 92 L.Ed.2d at 601, and holding that this delegation was an invalid attempt to vest a legislative official with power that was "executive" in nature).

I am of the opinion that legislative attempts to self-delegate governmental powers to legislator-dominated entities like the one in this case are particularly corrosive to our constitution's steel structural undergirding: the distribution and vesting of the state government's powers in separate departments that are in turn restricted constitutionally in *how* they can exercise their powers. This is especially so because such delegations partake of a certain "stealth" factor that serves to obscure the true encroaching effect of these provisions on the state government's other branches. As James Madison once observed, the Legislature "can with greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments." *See Metropolitan Washington Airports Authority,* 501 U.S. at 277, 111 S.Ct. at 2312, 115 L.Ed.2d at 259 (quoting *The Federalist* No. 48, at 334 (James Madison) (Jacob Cooke ed., 1961)).[8] For this reason,

---

**8.** In enacting a constitution that was intended to "bound the enterprise of [the General Assembly's] ambition" and "limit the sphere of its activity," *Taylor,* 4 R.I. at 355, the framers of Rhode Island's Constitution, like the framers of the Federal Constitution, intended to rescue both the executive and judicial depart-

"[t]here is more to fear when [the Legislature]—which is the source of all statutorily delegated authority—delegates not to the other branches, but to itself." *Constitutional Law*, § 2–6 at 146.

This is precisely why the conventional delegation-of-power cases upon which the majority relies are all inapposite to this situation. None of those cases involved an attempted delegation of the General Assembly's legislative powers to a legislator-dominated entity endowed with rulemaking authority, thereby enabling it to evade the strict bicameralism, public journal, and presentment limitations that apply whenever the General Assembly itself purports to act on such matters. Thus, if the General Assembly had delegated its lottery-regulation powers to some other body like a conventional administrative agency—instead of a commission whose membership is dominated and controlled by a majority of sitting legislators—the agency would not need to comply with the bicameralism and presentment requirements that apply to legislative actions because it would not be an entity controlled by the Legislature or its members.[9]

Accordingly, the United States Supreme Court, like our Court, long has upheld delegations of limited portions of the legislative power to executive or independent administrative agencies, provided the delegation is confined by some legislative standard(s) that can serve as a safeguard against executive or administrative abuse of that delegation. But until today, neither the United States Supreme Court nor our Court ever has upheld an attempted delegation of legislative and executive power to an entity controlled by a majority of sitting legislators.[10] Indeed, in every instance when the United States Supreme Court has confronted such a legislative attempt to circumvent the Federal Constitution's separation-of-powers, bicameralism, and presentment requirements, it has declared such legislation to be unconstitutional because "[the Legislature's] authority to delegate portions of its power to administrative agencies provides no support for the argument that [the Legislature] can constitutionally control adminis-

---

ments "from the eddying current of [the Legislature's] impetuous vortex." *Id.*

"In monarchical regimes the chief danger arose from the excesses of the crown, but in a republic that distinction necessarily fell to the legislature. Not only did it enjoy the political advantages that flowed from direct popular election, it could also exploit its formal rule-making authority to circumscribe the discretion of the other branches, override particular decisions to which it objected, or use its power of the purse to make the other departments bend to its will. Nor was this concern merely speculative. Experience demonstrated that '[t]he legislative department is everywhere extending the sphere of activity, and drawing all power into its impetuous vortex.'" Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* 53 (1996) (quoting *The Federalist* Nos. 37 and 48 (James Madison), and citing Merrill Jensen, et al. eds., *The Documentary History of the Ratification of the Constitution*, XV, 346, XVI, 4 (Madison, Wis., 1976)).

9. As one commentator has noted,
"[d]elegation to agencies or courts—unlike self-delegation to [legislative] committees or sponsors—leaves intact an important struc-

tural check on [the Legislature's] power. When [the Legislature] delegates lawmaking authority to an agency or court, it cedes some of its own control over statutory meaning to a distinct branch that, by constitutional design, is independent of [the Legislature]. This feature of the constitutional structure imposes substantial agency costs whenever [the Legislature] delegates a question to a court or an agency, rather than clearly resolving the matter itself. For that reason, it comports with the plan of the Constitution to deny [the Legislature] direct control over the interpretation of its own laws (at least when [the Legislature] does so through means short of bicameralism and presentment)." Manning, 97 Colum. L.Rev. at 711.

10. Apparently, in addition to the Lottery Commission, the only other state government entity whose membership currently consists of a majority of sitting legislators, is Rhode Island's Unclassified Pay Plan Board. G.L. 1956 § 36–4–16 (providing for a seven-member board that includes two state senators and two state representatives).

tration of the laws by way of a [legislative] veto," *Chadha,* 462 U.S. at 954 n. 16, 103 S.Ct. at 2785 n. 16, 77 L.Ed.2d at 346 n. 16, or by some other such attempted delegation of power to a subpart of the Legislature such as individual sitting legislators, whether they nominally sit as a board, commission, or agency, or under some other alias chosen by the Legislature to characterize its legislator-dominated creation. *See Metropolitan Washington Airports Authority,* 501 U.S. at 277, 111 S.Ct. at 2312, 115 L.Ed.2d at 259.

Thus, after deciding the *Chadha, FTC,* and *Bowsher* cases, the United States Supreme Court in *Metropolitan* struck down legislation transferring control of two airports near Washington, D.C. from the federal government to local authorities. The legislation conditioned the transfer of control on the local authorities' creation of a "Board of Review" composed of nine sitting legislators. As part of its enabling legislation, Congress invested this board with a broad veto power over decisions made by the new local airport agency. *Metropolitan Washington Airports Authority,* 501 U.S. at 277, 111 S.Ct. at 2312, 115 L.Ed.2d at 259. The *Metropolitan* Court noted that the Federal Constitution imposes two basic restraints on the Legislature: (1) "[i]t may not 'invest itself or its Members with either executive power or judicial power,'" *id.* at 274, 111 S.Ct. at 2311, 115 L.Ed.2d at 257 (quoting *J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624, 629 (1928)); and (2) "when it exercises its legislative power, it must follow the 'single, finely wrought and exhaustively considered, procedure' specified in Article I [presentment and bicameralism]," *id.* (quoting *Chadha,* 462 U.S. at 951, 103 S.Ct. at 2784, 77 L.Ed.2d at 344), and "may not delegate the power to legislate to its own agents or to its own Members." 501 U.S. at 275, 111 S.Ct. at 2311, 115 L.Ed.2d at 258. *See also Bowsher,* 478 U.S. at 755, 106 S.Ct. at 3202, 92 L.Ed.2d at 614. (Stevens, J., concurring). As a result, the *Metropolitan* Court did not

need to decide just what sort of power the congressional board of review would be exercising when it acted, because it was unconstitutional either way: "[i]f the power is executive, the Constitution does not permit an agent of [the Legislature] to exercise it. If the power is legislative, [the Legislature] must exercise it in conformity with the bicameralism and presentment requirements of [the Constitution]." 501 U.S. at 276, 111 S.Ct. at 2312, 115 L.Ed.2d at 259. Indeed, "[a]ny other conclusion would permit [the Legislature] to evade the 'carefully crafted' constraints of the Constitution * * * simply by delegating primary responsibility for execution of [policy to nonlegislative actors], subject to the veto power of Members of [the Legislature, supposedly] acting 'in their individual capacities.'" *Id.* at 269–70, 111 S.Ct. at 2308, 115 L.Ed.2d at 255.

Here, as in *Metropolitan,* we have "an entity created at the initiative of [the Legislature], the powers of which [the Legislature] has delineated, the purpose of which is to protect an acknowledged [state] interest, and [the controlling] membership in which is restricted to [legislative] officials." *Id.* at 269, 111 S.Ct. at 2308, 115 L.Ed.2d at 254. Thus, for the same reasons that the United States Supreme Court has repeatedly invalidated such egregious legislative attempts to bypass the bicameralism and presentment requirements of the Federal Constitution and to invest legislative officials with executive or legislative power, we should strike down this law as violating our State Constitution, containing in all aspects substantially the same provisions that caused the United States Supreme Court in the *Metropolitan, Chadha, Bowsher,* and the *FTC* cases to do likewise. Indeed, far from crafting what the majority calls "a somewhat ingenious doctrine," the trial justice applied settled principles of constitutional law to the Legislature's attempt to evade the State Constitution's restrictions upon the exercise of its powers when he declared the Lottery Commission's VLT vote

to be unconstitutional. The only "somewhat ingenious doctrine" at work here is the separation of powers and checks and balances provided for in our State Constitution. Moreover, the majority's suggestion that "[a]ll parties agree that there is no separation of powers issue in this case and [therefore] the claim of violation of the principle of separation of powers must fail" is belied by the fact that both the Governor and the Attorney General have filed legal briefs in this case that fairly bristle with myriad separation-of-powers arguments concerning why the General Assembly's creation of a Lottery Commission dominated by sitting legislators violates the separation-of-powers provisions in our State Constitution.

Notwithstanding these indistinguishable federal precedents applying the analogous constitutional provisions that concern us here and the trial justice's correct application of them to this case, a majority of this Court is apparently unwilling to rein in the General Assembly when it transgresses the constitutional limits that prevent it from executing the laws that it enacts and from delegating its powers to some legislative "mini-me" like the Lottery Commission.[11] By their advisory opinion last term and by their decision in this case, my colleagues virtually have handed over to the General Assembly on a platter the chief executive's constitutional rights and responsibilities, thereby letting the Legislature have its way to execute the very same laws that it passes. It has even been suggested by the House of Representatives in one of its briefs to this Court that, "under our constitution, the judicial and legislative departments are independent coequal branches of government" subject to the federal doctrine of separation of powers, but not so with respect to the "diminutive" executive branch. But just as a teacher should not sit by and idly watch while a big schoolyard bully beats up the smallest kid in the class, so too this Court should not twiddle its thumbs while the Legislature oversteps the constitutional limits of its powers and tramples upon the "diminutive" executive department. And lest any dispassionate observer be tempted to conclude otherwise, we are not parties to some faustian bargain with the General Assembly whereby, in return for the Legislature's largesse in allowing the Judiciary to function as an independent, coequal branch of government, the Court is obliged to wash its hands of any constitutional responsibility to check the Legislature's periodic propensity to overstep the constitutional limits on its powers and to exercise the executive power that our constitution has distributed away from that department and vested instead in the executive branch of government. On this defining legal subject, a judicial policy and practice of legislative appeasement will not bring constitutional peace in our time. And however "diminutive" the executive branch may appear when it has been shunted aside into the looming shadows cast by the legislative department, the State Constitution still vests it and not the General Assembly with all the state government's executive power. Thus, in my opinion, the Court has not only taken a wrong turn in deciding this case the way it has, but also, by failing to heed our state charter's fundamental directional signposts that specify how the Legislature must execute its powers, it both has lost its constitutional way and condoned a particularly insidious form of legislative lawlessness that will haunt our state for years to come.

All too often, as here, parliamentary supremacists and other extreme proponents of plenary powers for the Legislature have resorted to the General Assembly's pre-constitutional history as a reason for us to stand aside and let the Legislature have its way, notwithstanding that the framers of our constitution have included in its text both explicit and implicit limitations upon the exercise of legislative power that are contrary to that history. As in *Taylor*, 4 R.I. at 360–64, this Court has heard and

---

11. *Austin Powers: The Spy Who Shagged Me* (New Line Cinema 1999).

spurned this siren song before when declaring legislative acts unconstitutional, and we should do so again today. Indeed, "the unarticulated assumption" of such historical pleas for legislative or, for that matter, executive "power to deal with a crisis or an emergency according to the necessities of the case" is that "necessity knows no law." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 646, 72 S.Ct. 863, 875–76, 96 L.Ed. 1153, 1205 (1952) (Jackson, J., concurring). Yet even history and necessity must bow to the law when the constitution's fundamental structural principles are at stake because "the Framers ranked other values higher than efficiency." *Chadha,* 462 U.S. at 959, 103 S.Ct. at 2788, 77 L.Ed.2d at 349. Perhaps the most malevolent danger of such appeals to history or expediency is that they easily lead to the incremental tyranny of heaping, one upon the other, what may seem at the time and in isolation to be relatively small constitutional transgressions. But as Bertrand Russell once warned, this way of thinking "is like a warm bath that heats up so imperceptibly that you don't know when to scream." [12] We should make clear that the judicial decision to "scream"—to invoke our State Constitution whenever the Legislature, the Executive, the Judiciary, or any other governmental entity or official attempts to circumvent the restrictions and limitations set forth therein on their powers—will be made with particular regard to preserving the integrity of our constitution's most fundamental architectural principles. *See Constitutional Law,* § 2–6 at 152.

In my judgment, for a delegation of legislative power to an entity controlled by a majority of legislators to possess any chance of passing constitutional muster, it would have to, at a minimum, include the same limitations and restrictions that bind the Legislature's power when it purports to act pursuant to the Constitution. Otherwise, the Legislature will possess every incentive to make an end run around the potentially cumbersome and sometimes problematical constitutional obstacles of bicameralism, public-journal entries, and presentment whenever it wishes to enact laws that might not otherwise clear these legal hurdles or that might prove too controversial or time-consuming to subject to the normal—and constitutionally mandated—legislative process. But hereafter, who and/or what is going to stop the General Assembly from simply forming some type of a commission composed, for example, solely of the Speaker of the House and the Majority Leader of the Senate and empowering it (and, thus, these individual legislators) to enact whatever laws they deem expedient—say on education, the environment, or taxation? In the future, moreover, why should the General Assembly or any controlling subgroup thereof subject its will to the risk of a gubernatorial veto or to passage by both houses of the Legislature? And why should legislators have to submit controversial legislation to the inevitable public vetting that occurs when proposed bills are exposed to the usual legislative process? Indeed, why not allow the General Assembly simply to create a so-called "Legislative Leadership Commission" (LLC), appoint the legislative leadership as its sole members, and let them decide by themselves what laws to enact via administrative votes, resolutions, or rulemaking? In other words, why fool around with the rest of the Legislature, the Governor, or the Supreme Court—let alone with bicameralism and presentment limitations established by the citizens of Rhode Island—when an LLC, a Lottery Commission, or some other such legislative proxy or facsimile will suffice to finesse this whole constitutional kit and caboodle?

Surely, one of the most unwelcome yet momentous tasks for the highest court in any jurisdiction is to require itself and the other branches of government to toe the

12. *Constitutional Law,* § 2–6 at 151 (3d ed.2000) (quoting Leon Kass, "Implications of Prenatal Diagnosis for the Human Right to Life," in *Biomedical Ethics and the Law* 327 (James M. Humber & Robert F. Almeder eds., 1976)).

constitutional line whenever they purport to exercise their powers. Otherwise, an enormous risk exists that one or more of them simply will ignore these restrictions and proceed—methodically at times, haphazardly at others, but always inexorably and implacably—to aggrandize their powers at the expense of those vested by the people of this state in the other branches of state government. Such a process, I fear, is now apace in Rhode Island. Yet this Court steadfastly maintains that from a constitutional perspective it sees no evil, speaks no evil, and hears no evil in such legislative power plays. Rather, the majority blithely stamps its imprimatur on such acts, professing that we are powerless to do anything about how the General Assembly exercises its lottery regulation powers or whether it encroaches on executive powers in doing so. But by not enforcing the State Constitution's bicameralism and presentment requirements in this case the Court risks reducing these provisions to little more than "bare ruined choirs where late the sweet birds sang." [13] Furthermore,

> "[i]n a case so clear from doubt as this is, we should be equally unworthy of the post of duty in which we are placed by the constitution, if we swerved from the duty which that post devolves upon us, either from want of a just attention to, or a just sense of, the rights of litigants before us, oppressed by an unlawful exercise of power by the assembly, or from a false delicacy growing out of the conflict of power involved in the case between the legislative department of the government [and another such department]." *Taylor*, 4 R.I. at 364.

I also believe that today's decision serves to undermine an even more fundamental cornerstone of our State Constitution, one that the Federal Constitution in Article IV, section 4, guarantees to each state in the union: namely, a republican form of government. Indeed, with respect to the regulation of lotteries, it would seem that Rhode Island no longer has a republican form of government. Instead of a popularly elected legislature enacting lottery-related laws passed by both houses, recording those votes in a public journal of its proceedings, and then presenting the legislation to the Governor for his or her approval or veto, a commission controlled by a small subset of legislators appointed by the Legislature's leadership is running a mega-gambling operation that is raking in hundreds of millions of dollars without popular government approval of its regulations and in defiance of the constitution's bicameralism, public journal, and presentment requirements. Even dyed-in-the-wool parliamentary supremacists should blanch at a scheme that so blatantly bypasses our State Constitution's requirements for valid legislative action. Instead of wiping our brow and proclaiming how powerless we are to intervene in such matters, we, like the United States Supreme Court, should "not hesitate[ ] to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch." *Mistretta v. United States*, 488 U.S. 361, 382, 109 S.Ct. 647, 660, 102 L.Ed.2d 714, 737 (1989).

Yet we are told that, because this Court is "not interpreting the Constitution of the United States, * * * [but] a specific provision of the Rhode Island Constitution which squarely placed the power to regulate the state lottery in the hands of the General Assembly," it "violates no mandate of our constitution" to allow the General Assembly to delegate its power to regulate lotteries to a commission dominated by legislators. And never mind that the General Assembly has endowed this commission with the power both to enact laws pertaining to lotteries without satisfying the constitution's bicameralism, public journal, and presentment requirements and to execute those same laws, in deroga-

---

13. William Shakespeare, Sonnet LXXIII.

tion of our constitution's separate vesting of the executive power. But the constitution of our state is no different from the United States Constitution with respect to the key provisions that control the outcome in this case. Does our State Constitution provide for a tripartite division of the powers of government like the Federal Constitution? It does. Does it include bicameralism and presentment limitations on the valid exercise of legislative powers as does the Federal Constitution? Most certainly. And does it, like its federal counterpart, vest the executive power in a separate branch of government, endow the chief executive officer with that executive power, enjoin the chief executive officer to take care that the laws are faithfully executed, and thereby prohibit the other two branches from exercising such executive powers? Yes, indeed. *See In Re Dorr*, 3 R.I. 299, 301 (1854) (affirming that "power exclusively conferred upon the one department is, by necessary implication, denied to the other"). Thus, in all material respects pertinent to answering the legal questions that this case raises, the United States and Rhode Island Constitutions are formally and functionally the same.[14] As a result, the United States Supreme Court precedents cited herein are especially relevant and persuasive concerning how we ought to resolve the controversy before us, especially because we have repeatedly professed our reliance upon one or more of these precedents when deciding other separation-of-powers cases. *See, e.g., City of Pawtucket v. Sundlun*, 662 A.2d 40, 58 (R.I.1995) (citing *Chadha* with respect to

this Court's proper analysis of a separation-of-powers challenge); *State v. Jacques*, 554 A.2d 193, 196 (R.I.1989) (relying upon federal jurisprudence to define what constitutes a separation-of-powers violation); *Holmes v. Farmer*, 475 A.2d 976, 982–85 (R.I.1984) (relying upon *The Federalist* No. 47, at 343 (James Madison) (Dawson ed., 1864), and United States Supreme Court precedents on separation of powers to determine the scope of legislative privilege).

Moreover, the mere fact that the State Constitution specifically vests the General Assembly with the power to "regulate" and to "proscribe" lotteries does not mean that the General Assembly is therefore entitled to ignore all the other constitutional restrictions that limit its ability to exercise its legislative powers. First, its article 6, section 15 power to regulate lotteries is contained in the part of the constitution that addresses "the legislative power." Thus, it contains no authorization whatsoever for the General Assembly to execute any laws that it may pass pertaining to the regulation and/or to the proscription of lotteries. And contrary to the majority's assertion, the State Constitution vests no power in the General Assembly concerning "the supervision of lotteries in the State of Rhode Island," nor have all the parties and the trial justice conceded that the State Constitution has specifically placed the "supervision of lotteries in the General Assembly and not in the executive." The power to regulate is not the power to supervise.[15] Nor does it empower the

14. Contrary to the majority's assertion, I do not regard the State Constitution "as a mirror image of the Federal Constitution." Rather, our State Constitution is like the Federal Constitution in several respects and unlike it in others. But for the purpose of deciding this case, the likenesses—in particular, the bicameralism, the presentment, and the separation-of-powers limitations on the exercise of legislative powers—are controlling. Thus, the majority's attribution of a "mirror image theory" to this dissent reflects only a straw-man argument held up to its looking glass.

15. The word "regulate" is defined as "[t]o fix, establish, or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws." Black's Law Dictionary 1286 (6th ed.1990). Thus, the lottery amendment gives the General Assembly only the power to enact governing laws and rules pertaining to lotteries, but not to execute these laws or to supervise their administration. *See also North American Co. v. Securities & Exchange Commission*, 327 U.S. 686, 704, 66 S.Ct. 785, 796, 90 L.Ed. 945, 958 (1946) (defining "regulate" in the context of the Commerce Clause of the

General Assembly to act judicially with respect to interpreting the laws it enacts to regulate lotteries. Surely, it would be ludicrous to suggest that merely because the Federal Constitution grants Congress the power "[t]o regulate commerce" in Article I, section 8, it thereby endowed Congress with the ability to execute the commercial laws it passes or to circumvent the bicameralism and presentment requirements of the Federal Constitution by investing a subgroup of legislators with the power to pass commercial rules and regulations and then administer these same laws. Second, nothing in our constitution's language vesting the General Assembly with the legislative power to regulate and to proscribe lotteries entitles the General Assembly to avoid the separate article 6, section 2, requirement that it obtain "[t]he concurrence of the two houses" before "the enactment of laws" pertaining to lottery regulation. And under R.I. Const. art. 9, sec. 14, "[e]very bill, resolution, or vote * * * which shall have passed both houses of the general assembly shall be presented to the governor" for his or her approval or veto.

If the framers of the 1973 lottery amendment to our State Constitution had intended so radical a proposition that the other constitutional prerequisites to the valid exercise of legislative powers would not apply to the General Assembly's regulation and proscription of lotteries, they would have said so in a constitution that long ago removed the Legislature's pre-constitutional executive and judicial powers and bestowed them, respectively, upon the other two departments of state government. But they did not so provide. And because the text of our constitution gives no indication that these bicameralism and presentment provisions have been superseded, modified, or suspended in the case of lotteries, we should read article 6, section 15, of our State Constitution as requiring the Legislature to comply with the

normal and usual requirements for passing legislation whenever it attempts to regulate lotteries. Indeed, the existence of constitutional exceptions to the bicameralism and presentment requirements—for example, the advice and consent provisions of R.I. Const. art. 10, sec. 4, for the confirmation of the Governor's nominees to state court judgeships—proves that when the framers wished to create exceptions to the generally applicable rules that they laid down for valid legislative actions, they knew how to do so. With respect to lottery regulations, however, they carved out no such exception.

The majority also summons the case of *Narragansett Indian Tribe of Rhode Island v. State*, 667 A.2d 280 (R.I.1995) to its side, but it proves no boon companion in this context. That case held only that the Governor had no authority to bind the state to a lottery compact with the Narragansett Indians absent an express delegation of power to do so from the General Assembly. *Id.* at 282. But it said nothing whatsoever about the constitutionality of the General Assembly's creation of a Lottery Commission stacked with sitting legislators. In fact, the Court's opinion failed even to mention the Lottery Commission, much less did it pass upon its legality. And unlike the *Narragansett Indian* case, the issue here is not whether the constitution has vested the General Assembly with the power to regulate lotteries. It clearly has. Rather, the question is whether the General Assembly has exercised its power to regulate lotteries consistent with the constitution's restrictions upon *how* the Legislature is to exercise this power. On this point, the *Narragansett Indian* case offers no aid or comfort to the majority because it fails to address this question.

Somehow and in some way as yet to be explained, the critical constitutional distinction between the grant of a plenary legislative power to act with respect to a given subject (here, lotteries) and the

Federal Constitution as the power "to prescribe the rule by which commerce is to be governed"), but not to execute or supervise how these laws are administered.

structural and procedural limits on how, when, where, who, in what manner, and under what conditions that plenary legislative power can be exercised has been completely lost on the majority of this Court. It is as if, blinded by the bright light thrown off by the constitution's specific vesting of the lottery-regulation power upon the General Assembly, the majority is now unable to discern the constitution's express and implied limitations upon how that power must be exercised. But unless the Court soon recovers its constitutional bearings and finds the courage "to bound the enterprise of [the General Assembly's] ambition * * * [and thereby] to limit the sphere of its activity" to all that the constitution provides, but no more, *Taylor*, 4 R.I. at 355, its loss of legal vision risks plunging the people of this state into a long, dark age of subjugation to unchecked, unbalanced and unlimited governmental powers exercised by controlling members and subparts of the Legislature—notwithstanding a State Constitution that was enacted to prevent such a catastrophe from ever occurring.

In sum, the Legislature's creation of a Lottery Commission dominated by a majority of legislators that then votes to increase the number of VLTs in certain communities without satisfying these constitutional preconditions violates the above-referenced sections of our State Constitution. Therefore, we should affirm the Superior Court's judgment, void the General Assembly's attempt to circumvent these constitutional safeguards, and enjoin the commission's vote to increase the number of VLTs.

### Conclusion

The part cannot possibly be greater than the whole. If the whole Legislature cannot regulate and proscribe lotteries without acting bicamerally, without recording its proceedings in a public journal, and without first presenting its legislative acts to the Governor for a possible approval or veto, then how can a part of the Legislature—a mere five legislators—do so under the guise of acting as "the Lottery Commission?"

For these reasons, and for those set forth in my answers to questions II and III in *In re Advisory Opinion to the Governor (Rhode Island Ethics Commission—Separation of Powers)*, 732 A.2d 55, 96–111 (R.I.1999), I would affirm the trial justice's declaratory judgment and remand this case to the Superior Court for the issuance of a permanent injunction enjoining the Lottery Commission from implementing its vote to increase the number of VLTs.